UNITED STATES, Appellee

v

JOSEPH A. KORZENIEWSKI, Private First Class,
U. S. Army, Appellant

7 USCMA 314, 22 CMR 104

No. 7636

Decided August 31, 1956

*Daniel J. Flood,* Esq., argued the cause for Appellant, Accused. With him on the brief was *Arthur A. Maguire,* Esq.

*First Lieutenant Arnold I. Burns* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Thomas J. Newton.*

## Opinion of the Court

HOMER FERGUSON, Judge:

The accused was convicted of desertion in violation of the 58th Article of War, 10 USC § 1530. He was sentenced to dishonorable discharge, total forfeitures, and confinement at hard labor for fifteen years. The convening authority approved the findings but reduced the confinement at hard labor to three years. An Army board of review, after affirming the findings, further reduced the confinement to one year.

Korzeniewski was rotated back to the States after combat duty in Europe. Upon arrival in this country, he was given thirty days' leave, after the expiration of which, on August 25, 1945, he failed to return to his duty station. He was apprehended in his home town on December 1, 1954, approximately nine and one-half years later.

On December 29, 1954, the charge sheet was signed and the charge was

ordered investigated. Next, the appointed defense counsel requested a neuropsychiatric evaluation of the accused. The latter was examined and a psychiatric report was submitted on February 7, 1955. The report does not specifically answer the questions prescribed by paragraph 121 of the Manual for Courts-Martial, United States, 1951; nevertheless, it does state that initially the accused attributed his failure to return to the fact that he was upset emotionally as a result of his combat experience and afterward he became increasingly fearful of returning to face the punishment for the offense. Although relatives urged him to return and he was often hopeful that the Military Police would pick him up and remove his apprehensiveness, he felt "impelled" to stay away until he was forcibly returned. In addition the following comments are found in the report:

"The patient co-operated well during the psychiatric examination. He was obviously under a great deal of emotional tension, cried occasionally, and appeared to be distraught over his present plight. In spite of the great tension he was under the patient showed no particular thoughts or mannerisms that could be construed as of psychotic form . . . .

"The patient was given a standard battery of psychological tests which revealed him to be of low normal intelligence but with poor controls against his deeper impulses. There was some indication that this individual might break down if stresses were too great.

". . . Emotional Instability Reaction, chronic, severe. Predisposition is unknown . . . .

". . . Psychiatric clearance is given for court-martial; however, there is some question of whether this individual can participate intelligently in his defense if he gets too upset in the procedure."

Shortly after submission of this report, the convening authority ordered the charge treated as noncapital, and the accused was tried. He pleaded guilty and was sentenced to total forfeitures, dishonorable discharge, and fifteen years' confinement at hard labor, which confinement was reduced as heretofore described. The case was acted upon by the convening authority on February 14, 1955, and the Branch United States Disciplinary Barracks, New Cumberland, Pennsylvania, was designated as the place of confinement.

A document dated April 27, 1955, entitled "Admission Classification Summary" reveals that the accused was received at the Disciplinary Barracks on March 29, 1955. According to this document, the accused attributed his prolonged absence to a fear that if he returned to duty, he would be "committed to a mental hospital." He remained absent "because of this chronic fear of hospitalization." The report concluded that the patient was "quite emotional" and some form of therapy would be needed to assist him in overcoming the nervous condition and fear of hospitalization.

A week later Korzeniewski was sent to the Valley Forge Hospital for further treatment and evaluation. A report dated May 10, 1955, from the hospital Clinical Psychology Section, contains a statement to the effect that Korzeniewski "gives history of schizophrenic symptoms for past 7 or 8 years." This report recorded the further information that a thorough psychological examination could not be accomplished because "In spite of encouragement and reassurances on the part of the examiner, tension continued to mount in the patient." He broke his pencil, tore up his paper, and terminated the examination by "casting his head in his arms refusing to respond to or even speak to the examiner." Following this episode, the accused commenced receiving treatment for his mental condition. A medical certificate bearing the date of June 6, 1955, executed by the Assistant Chief of the Neuropsychiatry Department, announces that the accused was suffering from "a chronic psychosis" and was receiving "specialized treatments" which consisted of electro-convulsive therapy.

While Korzeniewski was at the Valley

Forge Hospital, his case came on before a board of review. This tribunal requested a psychiatric examination by a medical board. Such a board met and concluded that the accused was legally sane at the time of the commission of the offense and at his trial; however, he did not possess sufficient mental capacity to understand the nature of the appellate proceedings and to cooperate intelligently in that sphere of his defense. A clinical abstract of the report contains the following information:

". . . At the present time, he is at the end of a course of 17 treatments which will end on 8 July 1955 . . . .

"This patient has suffered from a neurotic depressive reaction, acute, severe, manifested by feelings of depression, tearfulness, tremulousness, sleeplessness, and ideas of losing control. At the present time, the patient has partially responded to a course of 17 electro-shock treatments, but is not ready for return to duty as he is slightly impaired, tremulousness remains, and patient is unable to participate actively at the present time in ward activities . . . .

. . . . . . .

"Condition: Improved. Maximum or optimal hospitalization has not been reached at the present time. Patient . . . is considered to be incompetent and not able to manage his own affairs."

Apparently this report was forwarded to the board of review, and that agency, on August 17, 1955, approved the findings and reduced the confinement to one year.

According to the Government's brief, on September 1, 1955, after a further medical examination, the accused was considered fit for duty. He completed his confinement and was restored to duty pending a completion of appellate review. Since December 12, 1955, he has been home on emergency leave.

The board of review acted on the case when the accused was mentally irresponsible. The first question then is whether such action was legal. The late Judge Brosman, in United States v Bell, 6 USCMA 392, 20 CMR 108, indicated that a board of review may complete an appellate review of an insane accused. But, Chief Judge Quinn, in United States v Washington, 6 USCMA 114, 19 CMR 240, would limit the power to proceed in such a case to this Court, which is concerned only with questions of law. Judge Latimer, in Washington, supra, was of the opinion that insanity should toll the proceedings at any stage of the appellate process. The present Court therefore is in agreement that a board of review, with its fact-finding powers, cannot proceed with the review of a case of an insane accused. The appellate review of such a case is tolled. If sanity is subsequently restored, review at that level may then be completed.

Before finally disposing of this case on that ground, however, we feel that some attention must be given to the argument advanced by the accused with respect to the issue of insanity. Because of the long interval of time which elapsed from the accused's desertion in July 1945, until he was examined by a psychiatrist in January 1955, the principle of mental capacity at trial time is distinctly separated from mental responsibility at the time the offense was committed. Other than the statement that Korzeniewski "gives history of schizophrenic symptoms for past 7 or 8 years" contained in a report of May 10, 1955, from the Valley Forge Hospital Psychiatric Section, there is nothing to indicate any mental aberrations on the part of the accused anywhere near the time of the commission of the offense. Giving the accused every benefit of the doubt, seven or eight years from May 1955 would fall considerably short of mental irresponsibility during August 1945, when the accused absented himself from the military. Moreover, Korzeniewski's mode of living during the nine intervening years, between the commencement of his absence and his apprehension, overwhelmingly suggests that he was mentally responsible during this period of time. He was a respected member of his community, was married and maintained a satisfactory home life. No doubt he was nervous

and worried as he must have realized that the day of reckoning would inevitably dawn. Very probably this long period of tension contributed ultimately to his mental derangement, which happened some three or four months after his trial, while he was serving his confinement. We can find nothing, however, in the record to indicate that the accused was mentally irresponsible at the time of the commission of the offense or was incapable of forming a specific intent to desert during this period of unauthorized absence from the military.

When we turn to the accused's mental capacity to stand trial, we find our answer in the pretrial psychiatric report dated February 7, 1955, four days prior to the trial. Although the report advised caution lest the accused become overly excited, it clearly stated that the accused was mentally competent to stand trial.

In summary, a careful review of the entire record leaves us with no alternative but to conclude that the accused was sane both at the time of the commission of the offense and at the time of trial. On February 7, 1955, he was found mentally competent, and four days later, he pleaded guilty to the charge. Thereafter, a medical board examined the accused while he was in confinement. The board submitted a report on July 28, 1955, which recited as of that date the accused was unable to manage his affairs; however, he had been sane at the time of the commission of the offense and at the time of trial. He was regarded as mentally competent and was released from the hospital during September 1955. Since December 1955, he has been home on leave. Nothing is contained in the record to overcome the presumption of the accused's mental responsibility for the offense or mental capacity to stand trial. Paragraph 122a, Manual for Courts-Martial, supra, pages 201–202. The disorders and derangements of the accused appear after his apprehension. From that time on, the record establishes that the accused's mind gradually deteriorated until a number of months after his trial he became temporarily deranged. He

appears initially to have been a nervous individual, and guilt feelings and fear of punishment undoubtedly gnawed away at his mental responsibility. When these apprehensions became reality, he began to deteriorate; however, he had not progressed to the point of incompetency by trial time. He became incompetent some three or four months after incarceration, and before his confinement had been served he had been mentally restored. He is presently sane and carrying on again in a civilian community.

Since the board of review acted in this case when the accused was mentally irresponsible, the case is returned to that body for further consideration in view of this decision.

Judge LATIMER concurs.

QUINN, Chief Judge (dissenting):

The record shows that after a period of combat duty in Europe as an infantryman the accused was rotated to the United States in July 1945. He was given a thirty-day leave but failed to return at its expiration. Almost ten years later he was apprehended by the military police in his home town, Plains, Pennsylvania. The February 7, 1955, psychiatric report notes that at the end of his leave the accused felt "quite upset"; he intended to return to his organization, but "some 'inner force' kept him from doing so." The report indicates also that the accused believed there was "something wrong with his mind," but despite the insistence of his family and friends, he refused to go to a doctor.

Three days after the psychiatric report the convening authority ordered the charge treated as noncapital. On February 11, 1955, the case came on to be heard. Apparently in accordance with a pretrial agreement with the convening authority, the accused entered a plea of guilty and consented to a stipulation to the effect that he deserted the service and that he was apprehended. No evidence other than the stipulation and the data from the charge sheet were presented to the court-martial, either before the findings or during the sen-

tence procedure. The court found the accused guilty as charged and sentenced him to a dishonorable discharge, total forfeitures, and confinement at hard labor for fifteen years. The convening authority approved the findings and modified the sentence by reducing the period of confinement to three years. His action was taken on February 14, 1955. The Branch United States Disciplinary Barracks, New Cumberland, Pennsylvania, was designated as the place for service of the accused's sentence.

When the accused was received at the Disciplinary Barracks on March 29, 1955, it would seem no specific psychiatric examination of him was made. That part of the Admission Classification Summary which relates to such examinations reads as follows: "b. Neuropsychiatric—(Not seen by Psychology Section)."

The Admission Classification Summary is dated April 27, 1955. Seven days later the accused was transferred to the Valley Forge Army Hospital, Phoenixville, Pennsylvania. He was sent to the hospital with a diagnosis of "Psychotic-depressive reaction." The accused was confined in a closed ward. On May 10, 1955, a report approved by the Chief, Clinical Psychology Section of the hospital, contains a comment to the effect that the accused "gives history of schizophrenic symptoms for past 7 or 8 years." The report also indicates that a psychological examination could not be accomplished because "in spite of encouragement and reassurances on the part of the examiner, tension continued to mount in the patient" and he "impulsively" broke his pencil, tore up his paper, and refused "to respond to or even to speak to the examiner." On June 6, 1955, the Assistant Chief of the Department of Neuropsychiatry executed a medical certificate which, in part, states that the accused "is suffering from a chronic psychosis" and that he is receiving "specialized treatments." These treatments consisted of electro-convulsive therapy.

While the accused was in the hospital his appeal came on for hearing before the board of review. The accused's condition was brought to the attention of the board of review, and it initiated a request for a psychiatric examination by a board of medical officers convened pursuant to the provisions of paragraph 121 of the Manual for Courts-Martial, United States, 1951. In due course, a medical board of three officers was appointed. On July 28, 1955, it met to examine the accused and to consider the medical records.

On the basis of its examination, the board of medical officers concluded that the accused was, at the time of the commission of the offense, so far free from mental disease or mental derangement as to be able to distinguish right from wrong and to adhere to the right. It also concluded that the accused at the time of trial possessed sufficient mental capacity to understand the nature of the proceedings against him and to cooperate intelligently in his defense. However, it further determined that the accused did not possess sufficient mental capacity to understand the nature of the appellate proceedings in his case and to cooperate intelligently in his defense. Finally, it disagreed with the original diagnosis of psychotic depressive reaction and concluded that the accused was suffering from a neurotic depressive reaction.

A number of internal factual inconsistencies appear in the board's report, and it is also factually inconsistent with a report included among the exhibits submitted by the Government as part of its brief. The report notes that the board met on July 28. However, various parts of the text plainly indicate that the board was not acting as of that date. Thus, in pertinent portions, the report[1] reads as follows:

". . . At the present time, he is at the end of a course of 17 treatments which will end on 8 July 1955. . . ."

---

[1] The text of the Report was changed by substituting the word "neurotic" for "psychotic." The same change was made in the Diagnosis section of the Report. In addition the numerical diagnosis classification was changed from 3011 to 3140. The date of these changes is not given.

"This patient has suffered from a neurotic depressive reaction, acute, severe, manifested by feelings of depression, tearfulness, tremulousness, sleeplessness, and ideas of losing control. At the present time, the patient has partially responded to a course of 17 electro-shock treatments, but is not ready for return to duty as he is slightly impaired, tremulousness remains, and patient is unable to participate actively at the present time in ward activities. . . .

. . . . . . .

"Condition: Improved. Maximum or optimal hospitalization has not been reached at the present time. Patient . . . is considered to be incompetent and not able to manage his own affairs."

As to the discrepancies between the report of the board of medical officers and the Government's exhibit, they are twofold. First, the former indicates that electro-convulsive therapy was started on May 28; the latter, however, shows that treatments were begun on May 20. Second, the report notes that seventeen shock treatments were scheduled, whereas the exhibit indicates that nineteen treatments were administered.

The report of the board of medical officers was approved by the commanding general of the Valley Forge Hospital on an unspecified date. It was then apparently forwarded to the board of review. On August 17, 1955, the board of review published a short form of opinion in which it approved the findings of guilty and modified the sentence by reducing the period of confinement to one year.

In its brief the Government informs us that the accused appeared before a second board of medical officers at the Valley Forge Hospital on September 6, 1955. His condition was found to be "improved," and he was "considered competent." The second board, however, made no findings as to the accused's mental responsibility at the time of the offense and his mental capacity to cooperate in his defense at the time of the trial. On September 7, the accused was returned to the Disciplinary Barracks. He completed service

320

of the reduced period of confinement on November 26, and he was returned to duty pending appellate review of his case by this Court. Since December 12, 1955, he has been home on emergency leave.

It is apparent from the psychiatric evaluations made of the accused that he was suffering from a serious mental deficiency before completion of the electro-shock treatments. The critical questions are the nature and the previous duration of the accused's condition. The psychiatric report before his trial recognizes that the accused had "poor control against his deeper impulses," although no thoughts or mannerisms were found which could be "construed as of psychotic form." Less than three months later, however, his mental condition was described as a "chronic psychosis" and indicative of a long-time "schizophrenic." These medical findings plainly cast substantial doubt upon the accused's capacity to entertain the specific intent charged. The report of July 28, 1955, which purported to make specific findings regarding the accused's mental responsibility, does not refer to this issue. Consequently, it does not remove the doubt. United States v Smith, 5 USCMA 314, 17 CMR 314; United States v Kunak, 5 USCMA 346, 17 CMR 346. However, even assuming, as the majority does, that the two medical determinations of the duration of the accused's mental illness are not sufficient to raise a factual issue as of the date of the offense, they plainly raise substantial doubt of the accused's capacity to cooperate intelligently in his defense at the time of trial.

The pretrial psychiatric report specifically pointed out that the accused "might break down, if stress is too great." The accused remained in confinement for almost four weeks after he was examined and before he was brought to trial. The record does not show the specific influence of these stresses. However, during all that time, he was faced with a possible death sentence and, in any case, with a sentence which would deprive him of his United States citizenship. See 8 USC § 1481 (8). In his post-trial review, the Staff

Judge Advocate recognized the problem but noted there was no indication that the accused was, in fact, upset at the trial. But what transpired at the trial can hardly provide the answer to the accused's mental capacity.

According to the record of trial, the court convened at "1352 hours." Three other accused, besides the accused in this case, were present. The oath was administered to the reporter; counsel for both sides recited their respective qualifications; the members of the court and all trial personnel were sworn; and then all accused except a Private First Class Grabosky were excused. The time is shown as "1320 hours." Obviously this is an error. It would seem, therefore, that after Private Grabosky's trial, the court reconvened for the trial of this accused at "1352 hours." The court remained in open session for just seven minutes before findings, and for only two minutes before and one minute after the sentence. In that ten-minute interval the accused would hardly manifest his disturbed mental condition to such an extent as to make it a matter for inclusion in the record. In fact, the symptoms of the accused's mental state, as expressed in the psychiatric reports, are not of the kind that would be casually recognized by lay persons as evidence of an abnormal mental condition.

Of course, the board of medical officers, which purportedly examined the accused on July 28, determined that he was suffering only from a neurotic depressive reaction and that he had capacity to cooperate intelligently in his defense. These findings, however, are inconsistent with the diagnosis of psychotic depressive reaction, which was made when the accused was transferred to the hospital, and with the diagnosis of chronic psychosis, which was made by the Assistant Chief of the Department of Neurophyschiatry at the hospital after the accused had been under treatment for more than a month. Furthermore, the board's findings are substantially weakened by the fact that from May 20 or May 28 the accused was so mentally incompetent as to require a series of seventeen or nineteen treatments of electro-convulsive therapy. At the completion of these treatments he was still unable "to understand the nature of the appellate proceedings in his case and to intelligently cooperate in his defense."

The atmosphere surrounding this entire case is, to say the least, unwholesome. Ten years had slipped away before there was any arrest, although the boy was in his own small home town all the time. And ten years passed after the alleged commission of the crime before there was any medical determination that the accused was sane. Even then (ten years later) the Government doctor found him sane and able to cooperate in his own defense, *but with this caveat:* "[T]here is some question of whether this individual can participate intelligently in his defense if he *gets too upset in the procedure.*" The warning signs were up! Finally, it is firmly established that when the board of review acted upon this case the accused was definitely *psychotic.*

Taking everything into consideration we have an utterly drab picture. Of course, we cannot speculate, but neither can the Government. The burden of *proof beyond a reasonable doubt* is always upon the prosecution.

There is no direct evidence in the record of an intent to leave, or to remain away permanently from, the military service; and there is no reasonable theory presented upon which to predicate such an evil intent! In my opinion, it is just as consistent to conclude that this boy was told to go home as it is to conclude that he ran away from the Army intending never to come back.

Hostilities in Europe were ended. The accused had fought for his country and had discharged his combat obligation without complaint. He returned from Europe and was stationed a relatively few miles away from his home. He went home on authorized leave and stayed home—why, nobody knows. To suppose that some incubus had taken possession of him and transformed an otherwise fine soldier into a deserter is sheer speculation. For myself, I am unwilling to speculate this lad into prison, or to stamp him with the infamy

of a dishonorable discharge. Rather, let us turn back the pages of history and be guided by the inexorable logic and profound wisdom of Sir Francis Bacon who in his Essay on Judicature had this to say:

". . . A judge ought to prepare his way to a just sentence, as God useth to prepare his way, by raising valleys and taking down hills; so when there appeareth on either side a high hand, violent prosecution, cunning advantages taken, combination, power, great counsel, then is the virtue of a judge seen to make inequality equal, that he may plant his judgment as upon an even ground. *'Qui fortiter emungit, elicit sanguinem;'* and where the wine-press is hard wrought, it yields a harsh wine, that tastes of the grape-stone. Judges must beware of hard constructions and strained inferences; for there is no worse torture than the torture of laws. Especially in case of laws penal, they ought to have care that that which was meant for terror be not turned into rigor; and that they bring not upon the people that shower whereof the Scripture speaketh, *'Pluet super eos laqueos* [He shall rein snares upon them];' for penal laws pressed, are a *shower of snares* upon the people. Therefore let penal laws, if they have been sleepers of long, or if they be grown unfit for the present time, be by wise judges confined in the execution: *'Judicis officium est, ut res, ita tempora rerum,'* etc. [A judge must have regard to the time as well as to the matter.] In causes of life and death, judges ought (as far as the law permitteth) in justice to remember mercy, and to cast a severe eye upon the example, but a merciful eye upon the person." [Emphasis supplied. The Essays On Counsels Civil and Moral of Francis Bacon, LVI—Of Judicature.]

Considering all the evidence, and the fact that in military law "insanity is given a preferred rating," United States v Burns, 2 USCMA 400, 405, 9 CMR 30, I believe that the interests of justice will be best served by a rehearing. The question of the accused's past and present mental condition can then be thoroughly explored, and the opinions of the different psychiatrists can be tested by cross-examination. Additionally, the court-martial will be able to consider the effect of the accused's mental condition upon his ability to form the intent required for the offense. I would, therefore, reverse the decision of the board of review, set aside the findings of guilty and the sentence, and order a rehearing.