UNITED STATES, Appellee

v

GEORGE CRIGLER, Private, U. S. Army, Appellant

10 USCMA 263, 27 CMR 337

*First Lieutenant Frank J. Lane, Jr.,* argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Colonel Ralph Herrod* and *Captain John F. Christensen.*

*First Lieutenant Paul R. Walsh* argued the cause for Appellee, United States. With him on the brief were *Major Thomas J. Nichols* and *First Lieutenant Chester F. Relyea.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

### I

This case has been in the military courts for a period in excess of three years. The delay, however, has been justifiable and may be attributed to the liberality of military law toward one suspected of being insane. Chronologically, the trial and appellate events occurred in this order. On November 8, 1955, the accused was convicted of robbery, attempted robbery, aggravated assault, and felony murder. He was sentenced to a dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for life. The convening authority approved the findings and sentence on January 7, 1956. Some six months later, a board of review in the office of The Judge Advocate General of the Army affirmed the conviction, and the accused subsequently petitioned this Court for relief. We granted review but, prior to hearing, appellate defense counsel moved to have the cause remanded to the board of review for reconsideration of its actions in view of a medical examination which disclosed that on October 31, 1956, the accused was insane. We granted the request and thereafter, on February 19, 1957, the board of review rendered an interim decision finding that the accused was then psychotic and that appellate review should be tolled. Thereupon, the record was returned to The Judge Advocate General of the Army and for a time the appeal remained dormant, but subsequently the accused regained his sanity. On October 25, 1957, a board of medical officers, after observing him during a hospitalized period, diagnosed his condition and found that he then possessed sufficient mental capacity to be able to assist in his own defense. The record was thereupon returned to a board of review, new appellate defense counsel was designated, and a hearing was ordered. Appellate defense counsel filed a motion before the board to again remand the record to The Judge Advocate General of the Army. This motion was denied, and on April 14, 1958, the board of review affirmed the findings and sentence. We granted the present petition to consider several assignments of error, only two of which upon closer examination are worthy of discussion. They will be identified as they are discussed in this opinion and while the remainder have been carefully considered, they are denied without comment.

### II

This tragedy occurred in the early morning of September 1, 1955, and the relevant facts are these: The murder victim was shot twice by the accused, who was holding three men at gunpoint in the headquarters of a battalion unit. Prior thereto, the accused had purchased a revolver at a pawnshop. He had consumed a substantial amount of liquor and engaged in some dice shooting. After meeting with little success in his gambling venture, he fired the weapon and the slug passed through the door of the hut. This incident resulted in a security guard obtaining the pistol from the accused, but it was later returned to him conditioned upon

his retiring without further difficulty. Near midnight, a military policeman on duty at the main gate of the post was surprised by the accused who entered the guard shack and, by brandishing the revolver, relieved the guard of his .45 caliber pistol. The accused then departed with the loot of his robbery. Shortly before, the sergeant of the guard and the battalion duty officer of the day had set out to determine the cause of the first firing. As they moved around a building, they encountered accused, who covered them with the pistol, ordered them to raise their hands, and demanded their car keys. Upon learning that neither had keys in their possession, the accused marched them at gunpoint to battalion headquarters to obtain possession of the keys. He identified one of the individuals by name and the other by rank. During the march, they sought to reason with the accused but, on at least two occasions, after uttering certain oaths, he threatened to kill them, stating that he had shot persons in Korea and he would subject them to the same treatment. When the three entered the headquarters, the charge of quarters was awakened and a search for the keys commenced. During the search, the victim, who was outside the building, concluded he could assist his fellow-servicemen and, to accomplish his purpose, he entered through the door and moved toward the accused. He was observed by the latter, who turned and fired twice. The shots were lethal, for the victim was dead when his body reached the dispensary. The accused was later apprehended hiding in the boiler room. He was in possession of the revolver, but the .45 pistol was not found until about a week later. It was located in the center of a clump of trees some 750 yards from where the killing occurred.

## III

The first assignment of error we consider raises the question of whether the law officer erred in instructing the court that, in determining his guilt or innocence, it should not concern itself with the post-trial disposition of the accused. In that connection, the law officer gave the following instruction:

"I would like to instruct you gentlemen that you will not consider the possible disposition of the accused in determining the guilt or innocence of the accused. Your findings in this case should be based on the evidence that you have seen or heard which has been brought before you together with my instructions."

The reason for the instruction arose out of the testimony of a medical expert testifying for the accused. In answering a question propounded by a court member, the witness stated:

". . . I feel very strongly that he [accused] should be kept—that society should be protected from him by his being kept in security for many, many years, if not for his whole life. In other words, I think he certainly needs restraint for the sake of society."

Before the matter was further explored, trial counsel contended the subject matter under discussion was immaterial, but he stated he would not oppose the court hearing further information if the defense counsel was not inclined to object. Defense counsel stated they had no objection, and the matter was further pursued but nothing more of import was produced. The effect of this testimony apparently caused the law officer to conclude that the accused might be prejudiced unless some instruction was given, and the matter came up for discussion in an out-of-court hearing called by the law officer to consider the instructions. The record of that hearing shows the defense counsel took an active part in the discussion on the questioned instruction, and they proposed the wording used by the law officer. From what we have stated, it follows as a matter of course that we need not consider whether the law officer expounded a correct principle of law for, if there was error in giving the instruction, it was induced by the accused and he cannot now found a reversal on an error he solicited. United States v Jones, 7 USCMA 623, 23 CMR 87; United States v Beer, 6 USCMA 180, 19 CMR 306.

## IV

The real crux of this appeal is the accused's mental capacity to assist his counsel at the time of trial. The issue grows out of the failure of the law officer in his instructions to isolate legal capacity from legal responsibility and submit both issues to the court-martial for determination. However, we find there was no prejudice to the substantial rights of the accused for the instructions, when considered in the light of the testimony, were sufficient to require the court to find beyond a reasonable doubt that the accused was sane on both occasions.

The testimony was devoted mostly to his mental condition at the time he committed the offenses but the observations conducted by the experts occurred up until trial. A number of medical experts testified at the trial, and we believe our opinion will be easier to follow if, insofar as possible, we convert the psychiatric terms used by them to nonmedical language. Generally speaking, it was agreed by all the professional witnesses that the accused suffered from hallucinations, delusions, disturbance of association of thoughts, and a disjointed form of talking in which much of what is said was not coherent and did not make sense. Using the glossary of medical terms, he was diagnosed as suffering from chronic schizophrenia. Apparently that condition had existed for some seven years prior to the crimes here involved, but during most of that time the accused was legally sane. However, when exposed to extraordinary pressures, he would have psychotic episodes and during those periods he was legally insane, that is, he was either unable to distinguish right from wrong or, knowing the difference, he could not adhere to the right. The record reflects that he has suffered several of these psychotic reactions during his life and, as we interpret the medical testimony, the dispute between the experts arises out of their differences as to whether he committed the offenses and was tried during a psychotic episode or while his mental processes were functioning in an orderly manner.

Of the five experts who testified at the trial concerning the accused's mental condition either for the defense or the Government, three were of the opinion that the accused was sane at the time of the offenses and at the time of the trial. The two experts who concluded the accused was not mentally responsible for his criminal act did not agree in all particulars for one doctor was of the opinion that his mind functioned within limits of sanity insofar as his capacity to distinguish right from wrong was concerned but, because of his low mentality, his weakened mental condition, and the suddenness with which the victim jumped toward him in an abortive attempt to seize the weapon, the killing was the result of an irresistible impulse. Accordingly, he concluded the accused was legally responsible for all offenses save murder. From the import of this witness's testimony, it is reasonably certain that the accused was mentally able to assist in his own defense as the irresistibility would exert no influence on the accused after the tragedy ended. The other psychiatrist who testified for the defense had the accused under observation for a considerable period of time. He first testified that the accused was mentally responsible and capable but, after obtaining additional information and making further observations of the accused during the trial, he was recalled and testified that he had changed his mind and reached a conclusion that the accused was legally insane at both the time of trial and the time of the offense.

From our recitation of the testimony, it should appear that, based on the testimony of two experts, the issue of mental responsibility was raised. Additionally, it appears that the testimony of one of the two raises an issue of mental capacity to stand trial. We encountered no difficulty in summarily disposing of accused's contention that he was not responsible for his criminal conduct for the reason that the law officer gave complete and extensive instructions on that issue. In addition, he fully covered the legal principle which required the court-martial to re-

turn a finding of a lesser included offense if the members concluded accused's mental condition prevented him from forming the specific intent necessary to support a finding of guilty on certain of the alleged offenses. However, the instructions were not specific enough within their four corners to call the court's attention to the necessity of returning a separate finding on the accused's capacity to aid his counsel at time of trial. Therefore, if that issue was raised and the findings do not embrace a holding that the accused was sane at that time, then he was prejudiced.

Although we recommend a more careful submission of the issue of mental capacity than was employed here, we are of the opinion that the accused was not prejudiced by the procedure used in disposing of this issue. While we are satisfied that the testimony of one psychiatrist would raise the issue of both mental reponsibility and capacity, we are certain the case was tried on the theory that the accused's mental condition did not change for the worse in the short period of time between the killing and the trial and that he must raise an issue of insanity at the commencement of the period or there would be no question about his capacity to aid in his own defense. The offense occurred on the first of September 1955, and the trial commenced on November 1, 1955, so that a period of only sixty days elapsed between the commission of the offense and the time of trial. Most of this time the accused was under observation by the medical service and no appreciable change was noted. The testimony of the doctors and lay witnesses and the theories of the prosecution and the defense point clearly to belief on the part of all participants at the trial that the mental condition which existed at the time of trial was no different than accused's mental condition at the time of the offense and that it was not necessary to have separate findings made on each issue. There are many circumstances shown by the record of trial which support this conclusion. The accused was defended by experienced and able defense counsel who were well versed in military law and mental diseases. At the commencement of the trial, they questioned individual members on voir dire about their willingness to consider fairly the defense of insanity. Prior to requiring the accused to plead to the charges and specifications, the law officer requested information as to whether the defense had any special motions, and counsel for the accused answered in the negative. A very excellent job was done by them in presenting the technical evidence involved in the defense of insanity and in cross-examining the medical experts. They questioned the witnesses with respect to accused's mental condition during the time he was under observation, but they did not seek to differentiate between mental responsibility and capacity. When it came time for them to proceed with the defense, their opening statement very clearly shows they believed the combination of mental illness and liquor rendered the accused irresponsible for his crimes. Significantly, they remained silent about his condition at the time of trial either because the effects of intoxication would then be missing or because they concluded the accused's mental condition had improved during the period. This is the language used by defense counsel in informing the court of the theory to be pursued:

"The defense intends to present evidence showing rather severe intoxication on the part of the accused and further, a history of mental disorder continuing up to and including the time the present offense was allegedly committed."

As previously mentioned, the record shows the accused was under observation by medical officers from immediately after committing the offenses until he was tried. His trial defense counsel were appointed sometime before the hearing as on October 6, 1955, they requested a three weeks' continuance to prepare their defense which was then known to be insanity, and they consulted with the doctors about accused's condition. Under those circumstances, it would indeed be necessary to charge defense counsel with careless indifference to the rights of

267

their client for us to find they permitted him to stand trial if there was any doubt in their minds about his capacity to cooperate intelligently with them. We find nothing in the record to support any such charge, and we particularly call attention to the fact that the only psychiatrist who testified to mental incapacity first testified that the accused could assist his counsel. Moreover, the evidence shows the accused was intelligent enough to follow his counsel's instructions not to discuss his case with anyone in their absence, including the psychiatrists. Furthermore, accused's counsel, as noted, were aggressive and well versed in psychiatry and military law and had his mental condition at that time been in doubt, it is reasonable to suppose that those who fought so capably to protect his rights would have raised mental capacity as an interlocutory question and requested a continuance until sanity was regained.

But there are other facts and circumstances reflected in the record to bear out our holding. There is not a scintilla of evidence that there was any change in accused's mental condition between the day of the crime and the time of trial. According to one doctor, he was suffering from a psychotic episode when he went beserk, but this expert did not express an opinion that the accused's mental condition had improved or deteriorated. His modified conclusions were determined while accused was standing trial, and his opinion seems to suggest that the condition was fixed and not varying between sanity and insanity during the full sixty-day period of time. In other words, his testimony leads us to believe that accused's latent schizophrenic condition had changed to psychosis preceding the incidents surrounding the killing and that a remission had not occurred prior to trial. Other qualified psychiatrists also observed the accused during the hearing and they concluded he was sane at that time. No medical witness suggested a significant change for the worse during the interim between the two critical times, and that seems to follow naturally because when the killing occurred accused's mental weakness was aggravated by intoxicants. Subsequent medical examinations of the accused long after the trial reflect changes in his mental status, but they do not indicate rapid fluctuations.

With the foregoing as a starting point, we look to the record and find the court-martial was required to make a finding on insanity as a defense to the crimes and on any influence it may have exerted on accused's capacity to form a specific intent. Before touching directly on that subject, we call attention to the fact that the law officer held an out-of-court conference on his proposed charge to the court and defense counsel were afforded an opportunity to consider the substance, completeness, and sufficiency of each instruction. Some suggested changes were recommended by them and accepted by the law officer, but no modifications were requested on the instructions covering insanity. In addition, after the charge had been given to the court, counsel expressed their satisfaction. We mention this not with the principle of waiver in mind but solely to illustrate the point that counsel at the trial were apparently satisfied that a finding on accused's mental condition at the time the offenses were committed would suffice to establish his capacity or lack of capacity to aid in his own defense. That conclusion finds some further support in that part of the law officer's charge which in substance stated that if a condition of insanity was shown to have existed, it was presumed to have continued in effect. Had the court members believed the testimony of the psychiatrist who reached the conclusion that accused was insane at the time of the offense, of necessity they would have had to accept his belief that the condition existed at trial.

There can be no doubt about the sufficiency of the instructions to cover the general issue of insanity. The law officer set out the proper tests, including the possibility of the accused acting under an irresistible impulse. He covered the doctrine of amnesia, partial responsibility, and other facets of the defense. He completed his charge by informing the court that:

268

". . . When, however, as in this case substantial evidence tending to prove that the accused was insane at the time of the alleged offenses is introduced, the sanity of the accused is an essential issue of fact which the Government must prove like all the other essential elements beyond a reasonable doubt. In determining this issue of fact, you are entitled to consider the evidence introduced at the trial pertaining to the sanity of the accused in the light of your common sense and your general knowledge of human nature and the ordinary affairs of life. Thus, you may consider that the general experience of mankind is that most people are sane and that insanity may be feigned with ease. This general experience may be taken into account in weighing the evidence pertaining to the issue of the accused's sanity. The burden of proving the sanity of the accused beyond a reasonable doubt, like every other fact necessary to establish the offenses charged, is on the prosecution. If, in the light of all the evidence, taking into consideration your general knowledge of human nature and the ordinary affairs of life, you have a reasonable doubt as to the mental responsibility of the accused at the time of the alleged offenses, you must find the accused not guilty of the offenses charged."

The court-martial found the accused sane and his mental condition such that he could form the specific intent to deprive the named victims of their property permanently. Accordingly, they returned findings of guilty of the principal offenses and refused to believe that accused's mental condition was impaired to such an extent that he was not responsible for the most serious crimes. If he was responsible for his criminal acts and his mental condition had not changed, the impairment of his faculties could not have been sufficiently severe to render him incapacitated at the time of trial. True it is that later his condition changed but the state of his mental health shown to exist at trial is not shown to have changed for the worse until October 31, 1956, approximately one year after the trial. While at that time a board of medical officers concluded he was chronically psychotic, they likewise determined that he was probably mentally responsible for his offense and capable of assisting his counsel at trial. Apparently the last mentioned psychotic episode ended some time in 1957, for on October 25 of that year a medical board found the accused was then able to cooperate with his appellate counsel. We thus have a picture of an accused who over a ten-year span has been diagnosed as suffering from schizophrenia and who has periods during which he is in the throes of psychotic reactions. All medical officers who have examined him have been fully aware of his intellectual endowments, diseases, and susceptibility to changes in his mental condition. All but one formed the opinion that he was competent to stand trial and we are sure the expert who concluded otherwise did no more than express an opinion that there was but one psychotic episode which extended at least over the period between September and November 1955. The court-martial chose to believe the experts who testified the accused was sane during the entire period, and it necessarily follows that the finding covers all events which occurred between its starting and ending date. For our purposes, the offenses and the trial would fall within those limits.

For the foregoing reasons, the decision of the board of review is affirmed.

QUINN, Chief Judge (concurring):

I agree generally with the discussion and conclusion on the instruction regarding the effect of the possible post-trial disposition of the accused. However, I prefer to approach the question of the accused's incompetency to stand trial from a different standpoint than that adopted in the principal opinion.

It is, of course, true an accused cannot be brought to trial unless he possesses sufficient mental capacity to understand the nature of the proceedings against him and intelligently to conduct or cooperate in his defense. Manual

**269**

for Courts-Martial, United States, 1951, paragraph 120c; United States v Korzeniewski, 7 USCMA 314, 22 CMR 104; United States v Jacks, 8 USCMA 574, 25 CMR 78. This question is separate from the problem of the accused's mental capacity to commit the offenses charged. One may be put in issue without the other. The record of trial shows that occurred here. Thus, in his closing argument counsel reviewed the accused's medical history over the years. He traced his treatment by electric shock and hospitalization for psychiatric evaluation. He also reviewed the accused's general conduct. He pointed out that common experience indicates mental capacity is not determined by a "single isolated incident" but by a "long course of behavior and signs of sanity or insanity." The argument plainly indicates the defense did not want a mere interlocutory[1] ruling on the accused's capacity to stand trial. Certainly, no such ruling was requested. From the trial proceedings it unmistakably appears the defense desired to go directly to the merits of the case to consider the definitive question of the accused's mental capacity to commit the offenses charged. On this record, therefore, it was not error by the law officer (on his own initiative) to refrain from ruling on the preliminary and purely interlocutory question or to submit that question to the court-martial for consideration.[2] See United States v Wolfe, 8 USCMA 247, 24 CMR 57.

Even though the accused did not raise the issue of his capacity to stand trial at the trial level, he was free to bring up the issue before the board of review. United States v Jacks, supra. While the case was before the board of review, appellate defense counsel moved for additional psychiatric examinations to determine the "mental responsibility of the accused at the time of the offense charged, at the time of trial, and at the present time." The motion was granted and a report of the examination was duly submitted to the board of review for its consideration. The report showed that the accused possessed sufficient mental capacity to understand the trial proceedings and to cooperate in his defense. On a second motion concerned with the accused's mental capacity, appellate defense counsel themselves submitted a later psychiatric report which indicated that while the accused was "suffering from a psychosis" he was "in all probability" able to distinguish right from wrong, adhere to the right, and able, at the time of trial, to understand the nature of "any proceedings against him and . . . intelligently . . . cooperate in his own defense." In the face of this evidence, the accused understandably did not urge the board of review to consider his mental competency at the time of trial.

I join in affirming the conviction.

FERGUSON, Judge (concurring in part and dissenting in part):

Although I agree with the result reached as to the instruction concerning post-trial disposition ▬▬ of the accused, I dissent from the treatment accorded the question of accused's incompetency to stand trial. I agree with the following statement contained in the principal opinion:

". . . [T]he instructions were not specific enough within their four corners to call the court's attention to the necessity of returning a separate finding on the accused's capacity to aid his counsel at time of trial. Therefore, if that issue was raised and the findings do not embrace a

---

[1] As we noted in United States v Williams, 5 USCMA 197, 17 CMR 197, incapacity to stand trial does not entitle the accused to a dismissal of the charges. At best, it will result in a continuance especially if the type of sanity is of a kind that is intermittent or transitory.

[2] I need not consider whether we correctly construed Article 51 in United States v Lopez-Malave, 4 USCMA 341, 15 CMR 341, and United States v Williams, 5 USCMA 197, 17 CMR 197, as subjecting the law officer's ruling on the interlocutory question of mental capacity to stand trial to objection by the court-martial. Cf. United States v Jacks, 8 USCMA 574, 25 CMR 78.

holding that the accused was sane at that time, then he was prejudiced."

The principal opinion then correctly finds that the issue of mental capacity was raised. But it is this Court's weighing evidence to determine factual issues and the conclusion that the findings of the court-martial embraced a holding of mental capacity to stand trial with which I cannot agree.

The principal opinion goes to great length to show that accused was ably defended by experienced counsel, that the defense declined to make any special motions prior to the plea, did not seek to differentiate between mental responsibility and capacity, and did not refer to lack of mental capacity to stand trial in their opening statement. These represent to me nothing more than arguments which the prosecution could have presented to the court-martial for its consideration in determining whether the accused did in fact possess sufficient mental capacity to understand the nature of the proceedings against him and intelligently to conduct or cooperate in his defense. Further, the opinion fails to accord proper recognition to the fact that the expert testimony to the effect that the accused's lack of mental capacity to stand trial was received *after* the recited events had transpired. In this regard it should be noted that the evidence is entirely consistent with the view that it was only when Dr. Evilsizer changed his testimony that the issue of mental capacity, as distinguished from mental responsibility, was put in issue.

The opinion then goes on to discuss evidence which more properly could be considered by an appellate court were the question one of sufficiency of the evidence to support a court-martial's findings that accused was capable of standing trial. That is not the issue before this Court.

In my view, the problem, and its solution herein, is clear. The issue of accused's mental capacity to stand trial was clearly raised. It was therefore the duty of the law officer to rule on the question subject to the objection of any member of the court. See Articles 51(b) and 52(c), Uniform Code of Military Justice, 10 USC §§ 851 and 852; see also United States v Williams, 5 USCMA 197, 17 CMR 197. This procedure was not followed. At no time, therefore, was that issue resolved. The law officer did not rule on the question and I cannot agree that the court-martial's verdict constituted a determination of that question inasmuch as it received no instructions whatsoever on the issue of the accused's mental capacity at time of trial. Whether the facts of the case are such that the mental condition of the accused did not change from the time of the offenses until the time of trial is also a question of fact for the court-martial and is not properly for determination by this Court. No amount of rationalization can disguise the simple truth that the majority herein have assumed unto themselves the power to weigh and determine issues of fact. That power has clearly been denied us by the law. Article 67(d), Uniform Code of Military Justice, 10 USC § 867.

Nor do I find any indication that the board of review found as a fact that the accused possessed sufficient mental capacity to understand the trial proceedings and to cooperate in his defense. This case was first decided by a board of review on July 20, 1956. At that time the board of review was concerned only with the question of whether the law officer properly refused to give a requested instruction on wrongful appropriation as a lesser included offense of robbery. Its only statement concerning capacity to stand trial was as follows:

"After thorough and repeated examinations, the accused has been found sane at the time the offenses were committed and mentally capable of participating in his own defense at time of trial as well as at the present time; and no error in this regard is now urged."

I believe the board of review's use of "found . . . mentally capable" refers to the results of the examinations rather than to any finding by the court-martial. As pointed out above, the court-martial, in my view, did not ren-

271

der any findings on accused's mental capacity. Further, the board of review said "no error in this regard is now urged." They, therefore, did not consider that problem and I know of no doctrine which would preclude an issue being considered by this Court simply because it was not raised before a board of review.

The case next came before a board of review on February 19, 1957. The board, relying upon a finding by a board of medical officers that accused did not then possess sufficient mental capacity to understand the nature of appellate proceedings in his case and to cooperate intelligently with this appellate defense counsel therein, concluded on the basis of United States v Korzeniewski, 7 USCMA 314, 22 CMR 104 (United States v Jacks, 8 USCMA 574, 25 CMR 78, not having yet been decided), that any further review by the board was tolled until such time as accused might regain his mental capacity. No holding that accused possessed the requisite mental capacity at the time of trial can be found in that decision.

Accused's case was before a board of review a third and final time on April 14, 1958. While specifically upholding a finding of accused's mental responsibility at the time of the offenses, the opinion contains nothing to show mental capacity at the time of trial. Moreover, the board of review specifically states therein:

"Accordingly, the previous findings which we made in the earlier decisions, *supra,* are so far as they involve factual matters, vacated; . . ."

Apparently all agree that the issue of the accused's mental capacity to stand trial was raised in the instant case. I find the issue raised but not resolved. An accused cannot properly be tried if he does not possess sufficient mental capacity to understand the nature of the proceedings against him and intelligently to conduct or cooperate in his defense. I would, therefore, order a rehearing.