**UNITED STATES**

v.

**Frederick W. THOMAS III, Aviation Antisubmarine Warfare Operator First Class (E–6), U.S. Navy.**

**NMCM 98 01573.**

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 19 March 1998.

Decided 28 Sept. 2001.

524

LCDR Michael J. Wentworth, JAGC, USNR, Appellate Defense Counsel.

Maj Edward C. Durant, USMC, Appellate Government Counsel.

Before DORMAN and ANDERSON, Senior Judges, and PRICE, Appellate Military Judge.

ANDERSON, Senior Judge:

A military judge, sitting as a general court-martial, convicted the appellant, pursuant to his pleas, of attempted unpremeditated murder of his son, premeditated murder of his son, two specifications of assault consummated by a battery on his wife, and kidnapping of his wife in violation of Articles 80, 118, 128, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 880, 918, 928, and 934. The appellant was sentenced to confinement for life, total forfeiture of pay and allowances, reduction to pay grade E–1, and a dishonorable discharge. The convening authority approved the sentence as adjudged but, as a matter of clemency, suspended adjudged forfeitures and waived automatic forfeitures.

After carefully considering the record of trial, the appellant's assignments of error, the Government's response, the appellant's reply, and oral argument, we conclude that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed. See Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c).

### Facts

a. Nature of Offenses

The appellant, who had been experiencing marital difficulties, called his wife at her place of work and asked her to come home for lunch. She agreed. He planned to effect a reconciliation with her or, if that was unsuccessful, to physically restrain her and then drive off with their 7–year–old son, Freddy, never to return.

When the appellant's wife returned home for lunch, the reconciliation failed. She tried to leave the house, but the appellant stopped her, wrestled her into the bedroom, and bound her hands and feet to their bed. He read to her a previously handwritten note: "My wife made an agreement when we got married til [sic] death do us part, she wanted to part so death do us." Prosecution Exhibit 1 at 5.

The appellant called his son into the bedroom and told him to give his mother a big hug and kiss. His son complied. The appellant then jumped onto the bed, placed his hands over his son's nose and mouth, and tried to smother him. The appellant's wife managed to free one of her arms and pushed the appellant's hand off of her son's nose. The appellant released his son.

The appellant and his wife then agreed to leave the house together as a family and

never return. As they exited the house, the appellant's wife grabbed her son, shouted for help, and ran toward a neighbor's house. The appellant ran after her, grabbed his son back, put his son in his truck, and drove off.

As evening approached, the appellant drove his truck up a logging road, and he and his son bedded down for the night in the truck's cab. During the course of the night, the appellant decided to kill himself and his son. He wrote a note blaming his wife for what had happened and left it on a tree limb outside of his truck. With respect to their son, the note said: "I'm taking him away from both of us." Prosecution Exhibit 1, Encl. (9). When he returned to his truck, he decided against killing himself or his son.

The next morning, the appellant attempted to drive back down the logging road, but his truck became stuck in soft dirt. For over an hour, he unsuccessfully attempted to extricate the truck. His efforts caused the truck's catalytic converter to rupture and started a slow-burning fire. The appellant saw flames coming out from under the truck, and he began to experience a psychotic episode. He believed that he saw law enforcement teams forming a perimeter around him and his son. He also believed that they were advancing and were about to shoot and kill him and his son. He decided to commit suicide instead, but he felt he should first kill his son to spare him from being hit from gunfire and suffering a more painful death. The appellant then suffocated his son by placing his hand over his son's nose and mouth, and left his son's body in the burning truck.

After killing his son, the appellant made some suicide gestures by cutting his own neck and wrists with a knife. He exited the burning truck and continuing cutting himself. The truck fire attracted the attention of local law enforcement personnel. They arrived at the scene and, after a struggle, apprehended the appellant.

b. Referral and Pretrial Agreement

Prior to trial, the appellant underwent a mental responsibility evaluation, pursuant to RULE FOR COURTS-MARTIAL 706, MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.), by a two-member board consisting of a psychiatrist and clinical psychologist. The board concluded that although the appellant was under the influence of a "brief psychotic disorder" constituting a severe mental disease at the time that he killed his son, he "was able to appreciate the nature and quality and wrongfulness of his conduct." Appellate Exhibit X(a).

The appellant was charged with, *inter alia,* the premeditated murder of his son. The convening authority referred the charge to a general court-martial without any qualifications, therefore making it a capital (death penalty authorized) case.

In preparation for trial, the defense requested that the convening authority appoint a mitigation expert (Dr. Lee Norton) to assist the defense as well as a forensic psychiatrist and psychologist (CAPT Michael Knowlan, MC, USN, and CDR Jerry Brittain, MSC, USN), to act as expert consultants. The convening authority approved the employment of the mitigation expert, but denied the employment of the two psychiatric experts. Appellate Exhibit XV. At a preliminary session of the trial, the military judge reversed the convening authority's denial decision and granted a defense motion to compel the appointment of both CAPT Knowlan and CDR Brittain. Appellate Exhibit XVII at 5.

Neither CAPT Knowlan nor CDR Brittain were ultimately used by the defense or called to testify at trial. The appellant's counsel, after consulting with their mitigation expert, decided to forego the assistance of both of these psychiatric experts and advised the appellant instead to pay for the services of a civilian forensic psychiatrist, Dr. Michael Maher. The appellant agreed, and Dr. Maher conducted an evaluation of him.

Dr. Maher agreed with the R.C.M. 706 board that the appellant experienced a psychotic episode at the time of his son's death. Additionally, he found that the appellant suffered "from significant symptoms of Obsessive Compulsive Disorder and depression." Defense Exhibit F at 3. Although his report failed to specifically address the mental responsibility issue, the record indicates that

Dr. Maher generally concurred with the board's conclusion.[1] Affidavit of LtCol Jeffrey G. Meeks, USMC, of 6 Jan 2000 at 2. After Dr. Maher's evaluation, the appellant agreed to plead guilty, pursuant to a pretrial agreement, to certain charges and specifications, including the premeditated murder of his son. In return, the convening authority agreed to refer the case non-capital and amended the charge sheet to so reflect. Appellate Exhibit XXXIV.

c. Providence Inquiry

During the providence inquiry, the appellant entered into a Stipulation of Fact in which he admitted every element of all the offenses to which he entered pleas of guilty, to include the premeditated murder of his son. Part of the stipulation read as follows:

At some point, AW1 Thomas consciously and deliberately determined he would kill Freddy first and then kill himself. Having made this determination, AW1 Thomas covered Freddy's mouth and nose. The intent of this action was to cause the death of Freddy. AW1 Thomas kept his hand over Freddy's mouth and nose until such time as Freddy died of asphyxiation. AW1 Thomas admits his actions directly caused the death of Freddy Thomas. At the time he killed Freddy Thomas IV, AW1 Thomas understood the nature and criminality of his conduct, and made a conscious choice to act. In so acting, he was not attempting to defend himself or another in any manner which constituted a legal justification or excuse for his conduct. AW1 Thomas knew at the time of this killing his conduct was wrongful, and he could have chosen not to act if he had desired to.

Prosecution Exhibit 1 at 8–9. In addition, in response to questions from the military judge, the appellant confirmed the facts of his son's death and his mental state at the time of the offense in the following lengthy colloquy:

MJ: ... What occurred between the time that the catalytic converter began to start the fire and the time that you made the decision to kill Freddy and kill yourself?

. . . .

ACCUSED: During this period, I began to suffer from a severe mental disease and defect, specifically a psychotic—a brief psychotic episode. As stated in the report of an RCM 706 Board, this severe mental disease and defect existed in my mind at the time of the killing of my son. As a result of this severe mental disease or defect, I believed that the killing of my son was a method of sparing him the pain of death by gunfire.

MJ: All right. I remember reading in the 706 Board, the opinions section that I was entitled to see, that you thought—you were under a belief that law enforcement officials might be after you and your son, and there might be some gunfire involved; is that correct?

ACCUSED: Yes, sir.

MJ: And you were afraid the gunfire might do harm to your son and to yourself; is that correct?

ACCUSED: Yes, sir.

MJ: And now, the doctor had, in the 706 Board, said that you were under a mental defect [or] disease which was severe, and he mentioned a psychotic episode, not that you are chronically psychotic, but whatever happened something triggered in your mind at that time that had you believe that law enforcement authorities would find you there and try to shoot you and your son; is that correct?

ACCUSED: Yes, sir. I believed they were actually there.

---

1. The appellant stated in his unsworn statement that he paid for his own psychiatrist, and "he came to the same conclusion" as the 706 board. Record at 891. Also, the trial defense counsel stated that Dr. Maher told him that the appellant "knew the difference between right and wrong at the time of the death." Affidavit of LtCol Jeffrey G. Meeks, USMC, of 6 Jan 2000 at 2. In addition, the appellant's affidavit relates that his trial defense counsel advised him that Dr. Maher concluded that he was "legally sane." Appellant's Affidavit of 10 Apr 2000 at 2. Finally, a voicemail left by Dr. Maher for the appellate defense counsel indicated that the appellant "did not meet the M'Naghten [sic] insanity criteria." Appellant's Reply to Government's Answer Opposing Motion for Psychiatric Evaluation of Appellant and Stay of Proceedings for the Period of Time Necessary to Accomplish the Evaluation of 14 Apr 2000 at 13 n. 15.

MJ: Okay. Did you see anything or hear anything that would lead you to believe that they were there?

ACCUSED: Yes, sir. I saw the arrival of Florida State Troopers, the Georgia Highway Patrol and the SWAT teams. I saw the development of these officers in a perimeter around me and Freddy. I saw the presence of my wife, her mother, and her mother's long-term live-in boyfriend.

MJ: Okay. Did you find out later that these people either did, in fact, exist there, or did you find out they didn't exist?

ACCUSED: I found out they did not exist.

MJ: But you believed you actually saw them; is that correct?

ACCUSED: Yes, sir.

MJ: Do you believe now that, because of an episodic trigger in your mind, that you had actually—your mind led you to believe that you saw something that was not there—after reviewing the evidence in the case and talking to your counsel?

ACCUSED: Yes, sir.

MJ: All right. Now, did your counsel fully advise you that under the law that if you were suffering under a severe mental defect, disease, or derangement and that you were unable to appreciate the nature and quality of your actions or the wrongfulness of your actions, that could be a defense that you could raise that might be a complete defense to the charges before the court, including most specifically this premeditated murder charge?

ACCUSED: Yes, sir.

MJ: And do you understand that if you were or even if you had a hallucination or a delusion but you knew that what you were actually doing yourself, your actions, you knew what your actions were and that you knew that they were wrong, you were able to appreciate what your actions were and appreciate that your actions were wrong, that even though you had this mental defect or disease at the time, that that would not then be a defense to this charge?

ACCUSED: Yes, sir.

MJ: And did you make that determination before you killed Freddy?

ACCUSED: Yes, sir.

MJ: And did you intend your actions to result in the death of Freddy?

ACCUSED: Yes, sir.

MJ: And did you, in fact, kill him, as it says in this Stipulation, by asphyxiating him by placing your hand over Freddy's mouth and nose so that he could not breathe?

ACCUSED: Yes, sir.

. . . .

MJ: Do you believe—you already told us that at the time that you made the decision to kill Freddy, you were under a belief that you had seen people at the scene that were surrounding you that would have started gunfire in some fashion; is that correct?

ACCUSED: Yes, sir.

MJ: Do you think that they were there to kill Freddy or to kill you?

ACCUSED: Both of us, sir.

MJ: All right. And why do you believe they were there to kill Freddy? Or what was going on in your mind, if you can remember back then, that led you to believe that they intended to do harm to Freddy, as opposed to you?

ACCUSED: Because, sir, they weren't saying anything to me, and they were just getting closer and closer to the truck.

MJ: Okay, so you decided to commit suicide but to kill Freddy first; is that correct?

ACCUSED: Yes, sir.

MJ: And was your intent to spare him being hit by gunfire; is that correct?

ACCUSED: Yes, sir.

MJ: Has your counsel advised you of the law of self-defense?

ACCUSED: Yes, sir.

MJ: You would have had a right to—if you had believed the circumstances to be such that you were in fear of being killed or you were in fear that Freddy would be killed by imminent harm from these people that you believed were there, that you could have taken action against the people that were doing the harm. Do you understand that?

ACCUSED: Yes, sir.

MJ: Has your counsel advised you, however, that you could not assist in killing or actually kill an innocent person, intentionally, to save that person what you believe might be pain and suffering from gunfire from these people you thought you saw?

ACCUSED: Yes, sir.

MJ: Do you understand that would not be self-defense, in other words, to kill Freddy by the method you employed, which you believed might be, I assume, a less painful way to die than how you expected he would die; is that why you did it?

ACCUSED: Yes sir.

MJ: Do you understand that would not be self-defense under the law?

ACCUSED: Yes, sir.

MJ: Do you understand that even if what you believed to be true actually occurred, that you had these people surrounding you and you thought they may be wanting to do harm to you or Freddy, that you had no legal right under the law to kill Freddy to avoid harm—to avoid pain and suffering to him. Do you understand that?

ACCUSED: Yes, sir.

MJ: All right, and are you convinced of that in your mind?

ACCUSED: Yes, sir.

MJ: Do you understand that would be legally wrong?

ACCUSED: Yes, sir.

MJ: You are convinced of that now, but let's talk back now, try to reflect yourself back—reflect your mind back to the 1st of April. Did you believe that you had a legal right to kill your son on that particular day?

ACCUSED: No, sir.

MJ: Did you believe that it would have been, intentionally killing him in the manner that you did, even though it may have caused him to avoid what you believe to be gunfire focused upon him, that that was a legal wrong?

ACCUSED: Yes, sir.

MJ: And did you think it was legally wrong back then?

ACCUSED: Yes, sir.

MJ: Even though you had the right to defend his life, you did not have the right to take his life. Do you understand that?

ACCUSED: Yes, sir.

MJ: And did you understand that at the time that this happened?

ACCUSED: Yes, sir.

MJ: Did you treat this, for lack of a better term—and advise me if you don't understand it, like a "mercy killing" of your son because of what you believed was going to happen?

ACCUSED: Yes, sir.

MJ: Did you feel in your own mind that the mercy killing would have been illegal?

ACCUSED: Yes, sir.

MJ: And I guess in your own mind you intended then to kill yourself so you wouldn't have to face those legal consequences, as well, and go through all of that? Or was it a combination of reasons?

ACCUSED: A combination, sir.

MJ: Okay. What were those reasons?

ACCUSED: First, I wanted to be with Freddy. Number two, I didn't think life was worthwhile without Freddy. Number three, I didn't want to get shot.

. . . .

MJ: And you felt that if you had, basically, committed a mercy killing of Freddy, then you didn't want to live without him; is that it, as well?

ACCUSED: Yes, sir.

MJ: I assume you believe in an afterlife of some sort?

ACCUSED: Yes, sir.

MJ: And it would be better to be in an afterlife with Freddy than to live without him; is that what you are basically telling the Court?

ACCUSED: Yes, sir.

MJ: All right. And were you able to go through this rationale in your mind at the time that—prior to putting your hand over Freddy's mouth and nose?

ACCUSED: Yes, sir.

MJ: And you weighed all of these things in your mind?

ACCUSED: Yes, sir.

MJ: How long was it from the time that you had seen these individuals around you until the time that you decided to kill Freddy and then yourself?

ACCUSED: I saw a picture in my head of Freddy and me laying in the truck, full of bullet holes and blood and tears and faces of pain. Then I immediately determined that I would kill first Freddy, then myself.

MJ: All right. Well, the question was, you saw these people around you at some point, were you just waking up when this happened or when did you first notice them there?

ACCUSED: (Consulting with counsel) About half an hour, sir.

MJ: And you said that during this half hour the people were getting closer and closer to you?

ACCUSED: Yes, sir.

MJ: Were they brandishing weapons—did you believe they were brandishing weapons; did you see any of that?

ACCUSED: Yes, sir.

MJ: Okay. You said nothing was said to you by these fictitious—not—by this hallucination or this delusion that you had; is that correct?

ACCUSED: Yes, sir. That is correct; they didn't say anything.

MJ: But you envisioned in your mind that the worst that was going to happen was that you would be shot and Freddy would be shot and you didn't want to face that; is that correct?

ACCUSED: Yes, sir.

MJ: And you didn't want Freddy to face that?

ACCUSED: Yes, sir.

MJ: Okay. So even if this actually happened, has your counsel explained to you that even if this actually happened, that you believed this to be true, and even if this was a true scenario that took place, that you did not have a lawful justification or excuse to kill your son?

ACCUSED: Yes, sir.

MJ: Okay, and did you understand that, as well?

ACCUSED: Yes, sir.

MJ: Do you believe at the time, based upon your experience, your moral values, your religious values if you have any, that it was wrong to have taken the life of your son in the manner that you did?

ACCUSED: Yes, sir.

MJ: Did you realize that at the time that you made the decision to kill him?

ACCUSED: Yes, sir.

MJ: Did you realize that at the time that you put your hand around his face and nose?

ACCUSED: Yes, sir.

MJ: Did you realize that at the time that he died?

ACCUSED: Yes, sir.

MJ: Do you believe that what you had seen had, in other words, as the doctors had indicated that you had an episodic mental disease or defect, that that mental process that was out of whack, for the lack of a better term, on that particular day, caused you to be unable to make a decision to kill your son?

ACCUSED: No, sir.

MJ: Did it in any way make you unable to understand that it was legally wrong to kill your son in the manner that you did?

ACCUSED: No, sir.

MJ: Do you feel that the episodic mental disease or defect that you had interfered with your ability to understand what actions you, yourself, took. In other words, to understand and realize that you were putting your hand over his face and mouth?

ACCUSED: No, sir.

MJ: Even though you believed that you had seen certain things, do you also actually remember today that you did put your hand over your son's mouth and nose with the specific intent that he not be able to breathe in order that he be asphyxiated and die?

ACCUSED: Yes, sir.

MJ: Is there any doubt in your mind?

ACCUSED: No, sir.

MJ: Now, do you believe that the cause of death to Freddy was, in fact asphyxiation,

as you pled to and as I defined that term for you?

ACCUSED: Yes, sir.

. . . .

MJ: The other question I have is do you admit that your killing of your son, Frederick W. Thomas, IV, was unlawful, that is, without legal justification or excuse in any manner?

ACCUSED: Yes, sir.

MJ: Do you admit that, notwithstanding your mental defect[,] disease or derangement that was episodic on that particular date, 1 April 1997, that, at the time of this killing that you knew that it was unlawful and you appreciated that fact at the time that you killed your son?

ACCUSED: Yes, sir.

MJ: Do you admit that there was sufficient time for you to reflect, from the time that you decided to kill your son until the time that you put your hand over his mouth and nose, for you to have premeditated, that is, to form the specific intent to kill your son, before you took your action to do so. Was there a sufficient amount of time to think about it?

ACCUSED: Yes, sir.

MJ: How much time elapsed between the time that you made that decision to kill him, so that he could avoid being shot, until the time you actually put your hand around his mouth and nose; just an estimate, if you can remember?

ACCUSED: I made the decision and then I acted.

MJ: Okay, so you made the decision; was it firmly in your mind?

ACCUSED: Yes, sir.

MJ: You had thought about this off and on and changed your mind several times; is that correct? From the 31st until the 1st?

ACCUSED: Yes, sir.

MJ: This very last time you thought about it, that's when you actually made the decision to kill your son; is that correct?

ACCUSED: Yes, sir.

MJ: And you actually acted right after that to do it; is that correct?

ACCUSED: Yes sir.

MJ: Do you admit that that is still premeditation as I defined that term for you?

ACCUSED: Yes, sir.

MJ: There is no set time of seconds, minutes, or hours that is required. Do you understand that?

ACCUSED: Yes, sir.

*Id.* at 710–26.

## Jurisdiction

The appellant first contends that his trial by military judge alone was without jurisdiction to try him for premeditated murder because the case had not "previously been referred to trial as a noncapital case," as required by Article 18, UCMJ, 10 U.S.C. § 818. We disagree.

■ If an offense is punishable under the UCMJ by death, a general court-martial must be composed of members, and a bench trial would lack jurisdiction. Art. 18, UCMJ; R.C.M. 201(f)(1)(C). However, a convening authority may direct the trial of a capital offense as noncapital (so long as the death penalty is not mandatory), and in such a case, a bench trial is permitted. *United States v. Stinson,* 34 M.J. 233, 238 (C.M.A. 1992); Art. 18, UCMJ; R.C.M. 201(f)(1)(C); and R.C.M. 601(e)(1), Discussion.

■ Although this case was initially referred as a capital case, the convening authority later modified the referral to noncapital as part of a pretrial agreement with the appellant to plead guilty. *See* R.C.M. 705(b)(2)(B); Art. 45(b), UCMJ, 10 U.S.C. § 845(b). Once referred noncapital, a bench trial had jurisdiction. *See United States v. Fricke,* 53 M.J. 149, 153–54 (2000); *United States v. Clark,* 35 M.J. 432, 433 n. 1. (C.M.A. 1992).

## Ineffective Assistance of Counsel

The appellant contends that he was denied the effective assistance of counsel because his individual military defense counsel failed to obtain a competent and objective evaluation of his mental responsibility at the time of the offenses—specifically one by CAPT Knowlan and CDR Brittain. He argues that in the

absence of such an evaluation, his pleas were improvident. We disagree.

█ The Supreme Court has established a two-pronged test for use in considering questions of ineffective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, the appellant must show that counsel's performance was so deficient, the errors so serious, that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id.* at 687, 104 S.Ct. 2052. In this regard, the appellant must show that under the circumstances, his counsel's performance was objectively unreasonable under prevailing professional norms. *Id.* at 688, 104 S.Ct. 2052. "Acts or omissions that fall within a broad range of reasonable approaches do not constitute a deficiency." *United States v. Dewrell,* 55 M.J. 131, 133 (2001). A strong, but rebuttable presumption exists that counsel has provided "adequate assistance." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. Second, the appellant must show that counsel's deficient performance prejudiced his ability to receive a fair trial. *Id.* at 687, 104 S.Ct. 2052. To satisfy this prong, "the [appellant] must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart,* 474 U.S. 52, 59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). In this case, the appellant does not advance past the first prong.

█ The record is clear that prior to entering his guilty pleas, the appellant received two mental examinations: one from an R.C.M. 706 board composed of a board-certified psychiatrist and a psychologist who administered a battery of tests, and another exam from an independent forensic psychiatrist. Based on these examinations, the individual military defense counsel decided to forego a lack of mental responsibility defense and pursue pretrial negotiations instead. That two potential expert witnesses, CAPT Knowlan and CDR Brittain, were bypassed in favor of a review by a civilian forensic psychiatrist was a tactical decision with which we find no incompetence. *See Dever*

*v. Kansas State Penitentiary,* 36 F.3d 1531, 1537 (10th Cir.1994) (holding that counsel is not ineffective for failing to further investigate post-traumatic stress disorder as basis for defense where counsel made a tactical decision after he discussed defendant's mental state with psychologist and psychiatrist); *Sidebottom v. Delo,* 46 F.3d 744, 753 (8th Cir.1995) (holding that defense counsel is not required to continue looking for experts just because one he consulted gave an unfavorable opinion). We will not second-guess a tactical decision made by a defense counsel where it falls within the broad range of professional competence. *Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052; *United States v. Anderson,* 55 M.J. 198, 202 (2001); *United States v. Grigoruk,* 52 M.J. 312, 315 (2000); *United States v. Morgan,* 37 M.J. 407, 410 (C.M.A.1993); *United States v. Rivas,* 3 M.J. 282, 289 (C.M.A.1977).

We find that the individual military defense counsel was justified in relying on the combined conclusions of the R.C.M. 706 board and the civilian forensic psychiatrist. *See Strickland,* 466 U.S. at 691, 104 S.Ct. 2052 ("[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."). He was under no duty to seek a third opinion before making the tactical decision to forego a lack of mental responsibility defense that was, in his view of the evidence and his considerable experience,[2] untenable. *See, e.g., Lingar v. Bowersox,* 176 F.3d 453, 461 (8th Cir.1999); *Babbitt v. Calderon,* 151 F.3d 1170, 1174 (9th Cir.1998); *Miles v. Dorsey,* 61 F.3d 1459, 1477 (10th Cir.1995); *Poyner v. Murray,* 964 F.2d 1404, 1419 (4th Cir.1992). Based on our review of the entire record, we are convinced that his performance did not fall below "prevailing professional norms." *United States v. Scott,* 24 M.J. 186, 188 (C.M.A.1987). In addition, we find that the proceeding was fundamentally fair and reliable. *See Strickland,* 466 U.S. at 686, 104 S.Ct. 2052.

2. The record indicates that the individual military defense counsel had previously tried over 400 courts-martial, including 8 homicide cases. Appellate Exhibit XVII.

### Premeditated Murder

The appellant next contends that his guilty plea to the premeditated murder of his son was improvident because the record disclosed that he killed his son in the heat of passion resulting from the fear of being shot, and because the record raised the defense of lack of mental responsibility. Having reviewed the entire record, we find no substantial basis in law and fact to question his plea. *United States v. Prater*, 32 M.J. 433, 436 (C.M.A.1991).

■ The providence inquiry, as extensively quoted above, in conjunction with the stipulation of fact, makes clear that the appellant committed the murder as a mercy killing after forming the specific intent to kill and after considering the act intended. *See* MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.), Part IV, ¶ 43c(2). He unequivocally admitted making a conscious decision to kill: "I made the decision and then I acted." Record at 725.

Even if we were persuaded that the appellant merely acted in the heat of passion, as opposed to acting with specific intent and premeditation, the law is not on the side of the appellant. The appellant's own delusion that he and his son were about to be shot by police simply does not conflict with his guilty plea to premeditated murder, nor support a finding of guilty to a lesser included offense of voluntary manslaughter. The courts "have quite consistently held" that when A, actually and reasonably provoked by B, in his passion strikes out at and kills C, known by A to be only an innocent bystander, that killing does not qualify as manslaughter. WAYNE R. LaFAVE, CRIMINAL LAW 716 (3d ed. 2000). *But see* MODEL PENAL CODE § 210.3. The rationale for this holding is that "a reasonable man would never be so greatly provoked as to strike out in blind anger at an innocent person." LaFAVE, CRIMINAL LAW 716. Thus, even if the appellant was actually and reasonably provoked by the apparitions of armed law enforcement personnel, we hold that he was not excused in killing his son, an innocent bystander.

■ With respect to the defense of lack of mental responsibility,[3] the military judge explained the nature of that defense to the appellant and obtained repeated admissions from him that it did not apply. In addition, the two psychiatric evaluations conducted on the appellant prior to his plea indicated that the defense was not a viable one. Because the record is clear that the appellant was able to appreciate the nature and quality and wrongfulness of his actions, the military judge did not abuse his discretion in accepting the plea.

In addition, we find that the appellant's failure to raise both these matters at trial constitutes waiver. *See* R.C.M. 801(g), 905(e), and 910(j). We will not "speculate post-trial as to the existence of facts which might invalidate an appellant's guilty pleas." *United States v. Johnson*, 42 M.J. 443, 445 (1995).

### Attempted Murder

■ The appellant next contends that his guilty plea to the attempted murder of his son was improvident because the record raised the defense of lack of mental responsibility. In support of this contention, he points to the following three statements that he made during the course of his unsworn statement: (1) "As [Freddy] was hugging her is when my thinking went real bad. I wasn't in a psychotic state. In those seconds I changed my life and everyone's life I know. I told Freddy to hug his mom again, and then I got on the bed and attempted to murder Freddy by suffocating him;" (2) ". . . I had no plan to kill anybody until Freddy was on the bed, and I snapped;" and (3) ". . . [My wife] says it was her struggling that caused me to release Freddy and I somewhat agree, but this also helped me snap back, and I said to myself, 'What am I doing?' and released Freddy." Record at 865, 870, and

---

**3.** The lack of mental responsibility is an affirmative defense to any offense if at the time of the commission of the acts constituting the offense, an accused, as a result of a severe mental disease or defect, is unable to appreciate the nature and quality or the wrongfulness of the acts. Art. 50a(a), UCMJ, 10 U.S.C. § 850a(a). The accused is presumed mentally responsible at the time of the alleged offense. R.C.M. 916(k)(3)(A). The accused has the burden of proving the defense of lack of mental responsibility by clear and convincing evidence. Art. 50a(b), UCMJ.

872. After reviewing these statements in the context of the entire record, we disagree that any mental responsibility defense was raised, or that the record revealed any substantial conflict with the pleas.

In the providence inquiry and the accompanying stipulation of fact, the appellant admitted all the elements of attempting to kill his son. Record at 727–35. In his recitation of the facts, he recalled that the day before he actually murdered his son, he tried to asphyxiate him by placing his hands over his son's nose and mouth. If his wife had not intervened and pushed his hand off of his son's nose, he would have killed him.[4] At the time that this occurred, he specifically denied being under "the effects of any halluciantion or delusion." Record at 729. He also admitted in his unsworn statement that he was not experiencing a psychotic episode at that time. Record at 860 and 875. Furthermore, the R.C.M. 706 board found "No Psychiatric Diagnosis" during this incident and concluded that he "was able to appreciate the nature and quality or wrongfulness of his conduct." Appellate Exhibit X(a) at 1–2.

The statements made by the appellant in his unsworn statement that he "snapped" prior to attempting to smother his son do not raise a mental responsibility defense or substantially conflict with the pleas. They merely reflect the appellant did not premeditate the act, but rather acted impulsively. Indeed, they may be characterized as the "quintessential statements of a rationalization made to minimize his culpability." *United States v. Oatney*, 41 M.J. 619, 632–33 (N.M.Ct.Crim.App.1994), *aff'd* 45 M.J. 185 (1996) (citing *United States v. Penister*, 25 M.J. 148, 153 (C.M.A.1987) (Cox, J., concurring)). Having examined the record, we find no substantial basis in law and fact to question his guilty pleas to the attempted murder of his son. *Prater*, 32 M.J. at 436. "We will not allow [the] appellant to throw a penalty flag and prevail after he has admitted on the record to each element of the charged offense[ ] which remain[s] uncontradicted to date." *United States v. Russell*, 50 M.J. 99, 100 (1999). We also will not overturn a guilty plea based on the mere possibility of a defense. *United States v. Faircloth*, 45 M.J. 172, 174 (1996).

### Sentence Appropriateness

Finally, the appellant contends that his sentence is inappropriately severe. After reviewing the entire record, we find that the sentence is appropriate for this offender and his heinous offenses. *See* Arts. 59(a) and 66(c), UCMJ; *United States v. Healy*, 26 M.J. 394, 395–396 (C.M.A.1988); *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982).

### Conclusion

Accordingly, we affirm the findings and sentence as approved on review below.

Senior Judge DORMAN and Judge PRICE concur.

---

4. The appellant reiterated these facts in his unsworn statement: "When I got on the bed, I put my left hand over Freddy's mouth and my right hand pinching Freddy's nose. [My wife] started screaming for me to stop and got her left hand free. She got my right hand off Freddy's nose. I was trying to hold Freddy and keep her hand away from mine. I was still trying to suffocate Freddy with one hand...." Record at 871.