# UNITED STATES COAST GUARD COURT OF CRIMINAL APPEALS
## Washington, D.C.

## UNITED STATES

### v.

## Brodrickus D. JOHNSON
## Operations Specialist Third Class (E-4), U.S. Coast Guard

## CGCMG 0209

## Docket No.  1254

## 7 February 2008

General Court-Martial convened by Commander, First Coast Guard District.  Tried at New York, New York, on 1 June 2005.

| | |
|---|---|
| Military Judge: | CAPT Sharon W. Fijalka, USCG |
| Trial Counsel: | LT Christopher F. Coutu, USCG |
| Assistant Trial Counsel: | LT Lisa M. LaPerle, USCG[1] |
| Civilian Defense Counsel: | Lars C. Johnson, Esquire |
| Detailed Defense Counsel: | LT James M. Toohey, JAGC, USNR |
| Appellate Defense Counsel: | LCDR Nancy J. Truax, USCG[2] |
| | LT Robert M. Pirone, USCG[3] |
| Assistant Appellate Defense Counsel: | LCDR Necia L. Chambliss, USCGR[4] |
| Appellate Government Counsel: | LT D. Sean Baer, USCGR |

## BEFORE
## FELICETTI, TUCHER & LODGE
Appellate Military Judges

TUCHER, Judge:

Appellant was tried by general court-martial, military judge alone.  Pursuant to his pleas of guilty, entered in accordance with a pretrial agreement, Appellant was convicted of the following offenses:  one specification of dereliction of duty, in violation of Article

---

[1] LT LaPerle was detailed as assistant trial counsel on 4 October 2005 in order to assist in the post-trial processing of the case.

[2] LCDR Truax filed the assignment of error and reply brief and remained as lead appellate defense counsel until 13 August 2007, at which point she became assistant appellate defense counsel and remained as such until she departed on terminal leave.

[3] LT Pirone was designated as lead appellate defense counsel on 13 August 2007.

[4] LCDR Chambliss was designated as assistant appellate defense counsel on 13 August 2007.

92, Uniform Code of Military Justice (UCMJ); one specification of willful and wrongful damage to personal property owned by another, in violation of Article 109, UCMJ; and one specification each of wrongful use, wrongful distribution, and wrongful introduction of cocaine onto a vessel, aircraft, vehicle, or installation used by the armed forces, all in violation of Article 112a, UCMJ.  The military judge sentenced Appellant to a bad-conduct discharge, confinement for eighteen months, and reduction to E-1.  After announcing the sentence, the military judge credited Appellant with 127 days of *Allen* credit for pretrial confinement served between 25 January 2005 and the date of trial. *United States v. Allen*, 17 M.J. 126 (C.M.A. 1984).  Under the terms of the pretrial agreement, the Convening Authority approved the sentence as adjudged but suspended all confinement in excess of fourteen months for twelve months from the date the accused is released from confinement.

Before this Court, Appellant assigns the following three errors:

I.      Appellant's pleas are improvident because the military judge failed to explain the defense of lack of mental responsibility after evidence presented on sentencing indicated that Appellant may not have been able to distinguish right from wrong.

II.     Appellant's sentence is inappropriately severe.

III.    This Court should consider the unreasonable and unexplained post-trial delay in determining the sentence that should be approved.

We address Appellant's first assignment below.  Because we find Appellant's pleas of guilty to be improvident, we set aside the findings and sentence and remand the case to the Convening Authority.

**Background**

Appellant enlisted in the Coast Guard on 4 November 2002 and, after completing Radarman "A" School in April 2003, was assigned to Coast Guard Activities New York.  Upon his arrival, Appellant was trained and qualified for duty within the command's Vessel Traffic Service branch.  In June of 2004, the Coast Guard Investigative Service (CGIS) commenced a criminal investigation of Appellant into suspected illegal

distribution, introduction, and use of cocaine. The investigation was predicated on a tip initiated by Mr. Daniel Rhodes, Appellant's friend who was at the time stationed at Activities New York. Rhodes provided a detailed account of Appellant's illegal drug activities and eventually agreed to act as a confidential informant in a "controlled buy." On the night of 16 June 2004, Appellant purchased four vials of cocaine for a total of $280 from a dealer in Manhattan, using $160 of his own funds and $120 provided by Rhodes.[5] The dealer also provided an extra quantity of cocaine in a bag as a bonus. Early the next morning, Rhodes picked up Appellant at the Staten Island Ferry terminal and drove back to Activities New York, where the cocaine was introduced onto the Coast Guard installation. Once in Rhodes' room at Unaccompanied Personnel Housing, Appellant distributed one cocaine vial and the plastic bag containing cocaine to Rhodes in exchange for $200. Following the transaction, Appellant was apprehended by CGIS agents and eventually provided a statement admitting to various drug-related offenses.

Appellant's drug offenses were referred to general court-martial along with other offenses related to misuse of his government credit card and vandalism of a television set owned by Rhodes. At trial, Appellant pleaded guilty to the above-stated charges pursuant to a pretrial agreement. During the providence inquiry conducted in accordance with *United States v. Care*, 18 USCMA 535, 40 C.M.R. 247 (1969), the military judge elicited Appellant's agreement with a stipulation of fact and to the elements of each offense, and accepted the guilty pleas. At this point in the proceedings, Appellant said little that would have led the military judge to suspect that his mental responsibility or mental capacity was in issue. During presentencing proceedings, however, Appellant introduced the testimony of Mr. Jeffrey Perles, a licensed clinical social worker and Clinic Director for the Army Substance Abuse Program at Fort Hamilton. Mr. Perles was qualified as an expert in chemical substance abuse and testified concerning Appellant's participation in the Substance Abuse Treatment Program while he was in pretrial confinement, during which time Mr. Perles saw Appellant nineteen times over a five-month period. (R. at 191, 197, 203.) Mr. Perles testified that the overall treatment strategy of his program

---

[5] $100 of the amount provided by Rhodes was intended to repay a previous debt to Appellant. The remaining $20 was a down payment toward the purchase of cocaine.

included identification of a psychosocial diagnosis as well as the development of an understanding of the particular needs of the chemical-dependent patient. (R. at 201.) Mr. Perle's testimony was offered to show that Appellant was a chemical substance abuser who suffered from serious mental illness that made him particularly susceptible to abusing illegal drugs in the absence of structured therapy and treatment. (R. at 196-99.) On direct examination by civilian defense counsel, Mr. Perles testified in relevant part as follows:

> Q: Can you explain, just generally speaking, what is a substance abuse problem?
>
> A: Generally, it's considered to be when a person uses a substance to self-medicate some problem that they can't cope with, and later on it takes on a life of its own, and the person uses the drugs for the sake of keeping a certain feeling going.
>
> Q: And do you believe that that happened in this case?
>
> A: Yes.
>
> Q: And what led you to that conclusion?
>
> A: Well, after working with Mr. Johnson, it was apparent that he did have a number of emotional issues. It was apparent that his affect was labile. It was obvious that his mood was oftentimes depressed. Oftentimes in counseling he was very detached, couldn't make contact with him, sometimes for a few minutes, until we were able to reestablish eye contact. We realized – I realized that he had underlying emotional problems.
>
> Q: And you believe that contributed to his substance abuse?
>
> A: I believe it's a contributing factor, yes.

(R. at 192-93).

Mr. Perles then explained why Appellant would have engaged in illegal substance abuse:

> A: My understanding is that when people are in need of changing their mood, they will reach out for whatever they can at the time, even if it's not

judicious, even if it has secondary fallouts for the person. Persons become so desperate at times just to feel better. They're feeling panic, they're feeling depressed, they want to change that feeling, and they act in ways that – of course, most people would think who were thinking it out would say it doesn't make sense, because now they're going to first have a secondary problem. But people become so desperate at the moment that they will self-medicate with different kinds of behaviors, to include chemicals.

Q: Were there particular anxieties or feelings that he expressed that you believe led to this specific substance abuse in this case?

A: He had a number of anxieties, fears, as well as depressions, that I believe he was trying to modulate by the use of drugs.

Q: Can you describe those?

A: Well, he described to me that he was at times having full-blown panic attacks. Sometimes he was in a manic phase.

(R. at 193-94.)

Mr. Perles also testified that he discussed Appellant's case with his Tricare psychologist and Tricare therapist and that "[t]hey shared with me that he was given clinical diagnoses of major depressive disorder and schizophrenia." (R. at 195.) Later, while discussing treatment options on cross-examination, Mr. Perles testified as follows:

Q: And is it your opinion also that should this – that Petty Officer Johnson is a substance abuser, and is not dependent on narcotics?

A: My assessment is that he's an abuser, and that he tends to be psychologically dependent on all self-medications that he's used. But he doesn't meet the DSM-IV criteria, in my opinion for being substance-dependent, because he doesn't have the physiological pieces of those components.

Q: Now, You [sic] state that, even with the conditions – or that Petty Officer Johnson allegedly has from assessments from others, and from your own assessments, that he can determine right from wrong; correct?

A: I think he knows right from wrong, yes.

Q: And what's the basis of that opinion?

A:  When I interviewed him, he seemed to be – when he was in contact, he was logical.

Q:  Someone of Petty Officer Johnson's weak emotional state has an ability to slide into an abuse type status; correct?

A:  That's what we're saying, yes.

Q:  Seeking to self-medicate?

A:  Yes.

Q:  Although they do have the ability to determine right from wrong; correct?

A:  Most of the time, yes.  He does have a schizophrenic piece to him that could sometimes take precedent.

Q:  Is that schizophrenia you've assessed, or somewhere along the line has been assessed?

A:  Well, I asked him about that in our interviews, about hearing voices, seeing things, having hallucinations, and he did tell me that he did have those hallucinations.

Q:  And you were aware of that before going to pretrial confinement back on January 25th, that when Petty Officer Johnson was sent down into confinement, that he stated that he had suicidal ideations at that time; correct?

A:  I'm aware of that, yes.

Q:  And you're also aware that the naval hospital on both occasions that he alleged this, that there was no such ideation – that there was not such ideation; correct?

A:  I'm not certain how that processed out.  I thought that there was concern – then there wasn't, then there was, and then there wasn't.  I think they went back and forth on that.

(R. at 204-06.)

Mr. Perles concluded his testimony opining that in the absence of extensive treatment in a structured setting, Appellant faced an uncertain future, including the

6

potential for suicide.  (R. at 199.)

### Discussion

Appellant argues that the military judge's failure to explain the defense of lack of mental responsibility rendered his pleas invalid after Mr. Perles, Appellant's substance abuse counselor, testified that he suffered from a serious mental illness that predisposed him to abusing illegal drugs and raised questions regarding his ability to distinguish between right and wrong.[6]  Based on our careful review of the record, we agree with Appellant that the defense of lack of mental responsibility was raised at trial and that the military judge committed prejudicial error in failing to explain the defense to Appellant.

A military judge's decision to accept a guilty plea is reviewed for an abuse of discretion.  *United States v. Eberle*, 44 M.J. 374, 375 (C.A.A.F. 1996) (*citing United States v. Gallegos*, 41 M.J. 446 (C.A.A.F. 1995)).  Prior to accepting a guilty plea, a military judge must explain the elements of the offense and ensure that there is a factual basis for the plea.  *United States v. Faircloth*, 45 M.J. 172, 174 (C.M.A. 1996).  A guilty plea should not be set aside on appeal unless there is a "'substantial basis' in law and fact for questioning the guilty plea."  *United States v. Prater*, 32 M.J. 433, 436 (C.M.A. 1991).  "If an accused 'sets up matter inconsistent with the plea' at any time during the proceeding, the military judge must either resolve the apparent inconsistency or reject the plea."  *United States v. Garcia*, 44 M.J. 496, 498 (C.A.A.F. 1996) (*quoting* Article 45(a), UCMJ); Rule for Courts-Martial (R.C.M.) 910(h)(2), Manual for Courts-Martial, United States (2005 ed.).  "Once the military judge has accepted a plea as provident and has entered findings based on it, an appellate court will not reverse that finding and reject the plea unless it finds a substantial conflict between the plea and the accused's statements or other evidence of record."  *Garcia*, 44 M.J. at 498.  While "[t]he existence of an apparent

---

[6] In support of his argument, Appellant has submitted the post-trial affidavit of Major John Rians, USAF, his treating psychologist since January 2006, who diagnosed Appellant with Schizoaffective disorder bipolar type, a severe mental illness which apparently declared itself when Appellant was sixteen years of age, predating his offenses.  Dr. Rians opined that he had observed Appellant go through psychotic episodes severe enough to warrant hospitalization, and drew a direct correlation between Appellant's illness and his illegal substance abuse.  Based on our disposition of this case on the record of trial, we did not have to consider this post-trial affidavit.

and complete defense is necessarily inconsistent with a plea of guilty," *United States v. Shaw*, 64 M.J. 460, 462 (C.A.A.F. 2007), the "'mere possibility' of a conflict is not a sufficient basis to overturn the trial results," *Garcia*, 44 M.J. at 498 (*quoting United States v. Prater*, 32 M.J. 433, 436 (C.M.A. 1991)).

R.C.M. 909(a) provides that no accused "may be brought to trial by court-martial if that person is presently suffering from a mental disease or defect rendering him . . . mentally incompetent to the extent that he . . . is unable to understand the nature of the proceedings . . . or to conduct or cooperate intelligently in the defense . . . ." R.C.M. 916(k)(1) further provides that it is "an affirmative defense to any offense that, at the time of the commission of the acts constituting the offense, the accused, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his . . . acts." An accused, however, is presumed to be mentally responsible for his offenses and to be mental competent to stand trial. *Shaw*, 64 M.J. at 463.

Notwithstanding this presumption, our superior court has long recognized that "mental health issues bear special status" in military justice proceedings. *Id.* at 462. Each military judge, convening authority, counsel, and court member is required to notify appropriate authorities or take proper action whenever there is reason to believe that an accused lacks mental responsibility for any charged offense, or lacks capacity to stand trial. *United States v. Best*, 61 M.J. 376, 382 (C.A.A.F. 2005). This includes the responsibility to convene, or initiate procedures to convene, a mental examination by a board consisting of qualified mental health experts. R.C.M. 706. Where the need for an R.C.M. 706 inquiry is indicated, "only those physicians, psychiatrists, and clinical psychologists listed in [R.C.M. 706(c)(1)] may *initially* answer the specific questions . . . concerning mental responsibility at the time of the offense." *United States v. Sims*, 33 M.J. 684, 686-87 (A.C.M.R. 1991).

Where, in a guilty plea case, an accused makes statements or presents other evidence that raise the affirmative defense of lack of mental responsibility, the military judge must, either *sua sponte* or at the request of counsel, resolve the conflict through

discussions with the accused so as to ensure the defense is not available. *See* Article 45(a), UCMJ; *see also United States v. Harris*, 61 M.J. 391, 398 (C.A.A.F. 2005). This responsibility exists "regardless of whether mental health experts have previously determined that the accused was mentally responsible for his offenses." *United States v. McGuire*, 63 M.J. 678, 681 (A.Ct.Crim.App. 2006). Where, during a plea inquiry, the military judge has reason to believe that the accused may have lacked mental responsibility at the time of the offenses, it generally is not sufficient for a military judge merely to elicit an accused's opinion that the affirmative defense does not apply in his case. *See id.* at 682. The accused must demonstrate an understanding of the defense and provide a factual basis for why it does not apply to him. *Id.* at 682 n.3.

It is well-settled that the "'mere tactical possibility of raising a defense' does not of itself warrant rejection of an otherwise provident plea." *United States v. Clark*, 28 M.J. 401, 407 (C.M.A. 1989) (*citing United States v. Logan*, 22 USCMA 349, 351, 47 C.M.R. 1, 3 (1973)). The mere fact that an accused has been diagnosed with mental illness does not necessarily raise the lack of mental responsibility defense. *See Shaw*, 64 M.J. at 463 (accused's uncorroborated reference in his unsworn statement to having been diagnosed with bipolar disorder did not require the military judge to reject his guilty plea, since the military judge was entitled to rely on the presumption "that the accused [was] sane," as well as the presumption that counsel was competent and had "conducted a reasonable investigation into the existence of the defense"). Similarly, an accused's seemingly irrational behavior, standing alone, may not be sufficient to trigger the defense. *See United States v. Thomas*, 56 M.J. 523, 533 (N.M.Ct.Crim.App. 2001), *aff'*d, 56 M.J. 467 (C.A.A.F. 2002) (accused's unsworn statement that he "snapped" prior to attempted murder of his son did not raise mental responsibility defense; accused repeatedly admitted defense did not apply, and pre-trial psychiatric evaluations indicated that the defense was not a viable one); *see also United States v. McGuire*, 63 M.J. 678 (A.Ct.Crim.App. 2006) (military judge not required to inquire into mental responsibility defense, notwithstanding repeated references to psychiatric therapy throughout record and accused's outbursts of laughter and crying during providence inquiry, where prior R.C.M. 706 board concluded accused was able to distinguish right from wrong, and

defense did not request any further inquiry into accused's mental condition).

The question here is whether the record raises the mental responsibility defense providing a substantial basis to question Appellant's guilty pleas. The Government contends that the record fails to raise a substantial conflict concerning his mental status. We agree that Appellant initially said almost nothing during the providence inquiry to suggest that his mental responsibility or mental capacity was in issue. Our review of the record indicates that Appellant provided apparently lucid, focused, and detailed answers regarding the offenses. He indicated that he understood what he had done and why it was wrong, testifying, for example, that he "started using [cocaine] wrongfully, but I knew that I shouldn't have used it." (R. at 73.) Moreover, Appellant's two trial defense counsel stated they were not aware of any other facts that might constitute a legal defense. (R. at 101.)

Nevertheless, we have identified other portions of the record that point to a linkage between the accused's mental illness and his criminal conduct, which the military judge did not identify or examine in any meaningful way. We note that in his unsworn statement, Appellant directly contradicted parts of his earlier testimony about the beginning of his offenses, saying, "I started using drugs to self-medicate because I was completely sad at this point . . . . [A]t this point, I was hearing voices, seeing things that weren't there. It just left me broken. I was a mess pretty much." (R. at 244.) In addition, there is significant documentation in the record, both prior to and during trial, that Appellant was receiving medication and treatment for serious, long-term mental illness.

Moreover, a defense witness, Mr. Perles, the Clinic Director for the Army Substance Abuse Program at Fort Hamilton and Appellant's substance abuse counselor, testified at length during the defense sentencing case that Appellant was a chemical substance abuser whose "major depressive disorder and schizophrenia," as manifested through anxieties, fears, and depressions, rendered him susceptible to self-medication through the use of illegal substances. (R. at 193-94.) Mr. Perles opined that Appellant

could distinguish between right and wrong "most of the time," but qualified his statement by noting that Appellant had reported having hallucinations and had "a schizophrenic piece to him that could sometimes take precedent." (R. at 205.)

We also note that other defense submissions in the record refer to Appellant's mental illness and ongoing mental health treatment, although not as a defense to the charges. For example, Defense Exhibit B, a letter from Dr. Duval-Arnould, CAPT, MC, USN, a Navy psychiatrist who diagnosed Appellant with cyclothymic disorder - "a type of bipolar disorder" – explained that Appellant experienced "hypomanic episodes" that "may have contributed to his engaging in destructive activities such as drug use and excessive spending," and that Appellant's cyclothymic disorder "created an enhanced susceptibility to impulsive behavior," including drug abuse.

Defense Exhibit C is a record of treatment at a hospital emergency room for a severe depressive episode that occurred in December 2004, prior to trial. Exhibit D is a clinical social worker's assessment prepared on 22 November 2004, following an emergency room visit for a severe depressive episode. Exhibit D identified a diagnosis of bipolar disorder, with most recent episode depressed with psychotic features, along with substance-related disorder in partial remission. Included is a statement that Appellant reported self-medicating with street drugs because he was concerned about reporting his depression to the Coast Guard.

Considering Appellant's in-court statement that he was hearing voices, having hallucinations, and self-medicating with illegal substances to cope with his depression at the time of his misconduct, in conjunction with Mr. Perle's testimony and Defense Exhibits B, C, and D, we have little difficulty concluding that the record raises a substantial basis for questioning the guilty pleas. Critical to our conclusion is Mr. Perles' opinion that Appellant could distinguish between right and wrong only "most of the time" because of "a schizophrenic piece to him," supplemented by the other evidence of a mental disease or defect. Moreover, Dr. Duval-Arnould's brief conclusory statement in Exhibit B that Appellant's mental illness did not amount to an excuse for his behavior did

11

not relieve the military judge of the responsibility to at least explore this potential conflict with Appellant and explain the affirmative defense of lack of mental responsibility. A medical expert's contrary opinion, standing alone, will not rescue a guilty plea where the potential defense of lack of mental responsibility is raised at trial and the military judge fails to adequately explore the matter directly with the accused. *See McGuire*, 63 M.J. at 681.

Our decision is not inconsistent with *Shaw*. In *Shaw*, the accused made an uncorroborated reference to having been diagnosed with bipolar disorder in his unsworn statement. *Shaw*, 64 M.J. at 462. C.A.A.F. held that the military judge's failure to conduct any inquiry into the claimed diagnosis did not require reversal of the conviction, where there was no other evidence in the record to substantiate the claim and the accused had never asserted that his illness had impacted his plea or rendered him unable to appreciate the nature and quality or wrongfulness of his acts. *Id.* at 462-63. The instant record presents a far more developed record of severe mental illness that could have affected his ability to form the intent to commit the offenses charged, and his decision to plead guilty. *See id.* at 463-64. *Compare United States v. Harris,* 61 M.J. 391, 398 (C.A.A.F. 2005) (accused's guilty pleas set aside where post-trial R.C.M. 706 sanity board and Article 39(a) session determined that accused suffered from severe mental illness at time of offenses, and military judge failed to resolve issue by explaining the defense of mental responsibility and inquiring into the potential impact of the diagnosis on the accused's pleas).

Military judges are expected to take "*particular care* to make sure that considerations of mental health do not put the providence of the plea at issue." *Shaw*, 64 M.J. at 462 (emphasis added). After making allowances for the military judge's superior position to observe the Appellant's in-court demeanor, we nonetheless are convinced that the military judge should have conducted an inquiry with Appellant and his defense counsel concerning Appellant's mental health so as to satisfy herself that a defense under R.C.M. 916 did not apply. In particular, the military judge should have reopened the providence inquiry to explain the significance of Mr. Perle's testimony and that a defense

12

to the charges could exist, and to fully explore whether the circumstances of his particular mental illness gave rise to any defense in Appellant's mind to the charges, and whether Appellant still wished to plead guilty. S*ee United States v. Zachary*, 63 M.J. 438, 444 (C.A.A.F. 2006); *United States v. Outhier,* 45 M.J. 326, 331-32 (C.A.A.F. 1996).

Citing *United States v. Lewis*, 34 M.J. 745 (N.C.M.R. 1991), the Government urges us to find that any affirmative defense based on lack of mental responsibility has been waived. (Government's Answer 3.) We note that the record does not disclose that any court personnel appreciated the potential significance of the defense or the potential impact of Appellant's mental health on his crimes. *See United States v. Peterson*, 1 M.J. 972, 975 (N.C.M.R. 1976) (key issue is whether "'the accused and his counsel (and the judge) were aware of the legal effect of the evidence claimed to be inconsistent with the plea of guilty'"). Moreover, there is little in the record to indicate that the question of Appellant's mental responsibility and competency was investigated or litigated during the pretrial phase of this case. Under these circumstances, we cannot find that the defense has been waived. Were we to apply waiver, we would be holding Appellant to having a greater understanding of his pleas than defense counsel, trial counsel, and the military judge. We find the cautionary language in *United States v. Harris* particularly instructive on this point:

> We do not see how an accused can make an informed plea without knowledge that he suffered a severe mental disease or defect at the time of the offense. Nor is it possible for a military judge to conduct the necessary *Care* inquiry into an accused's pleas without exploring the impact of any potential mental health issues on those pleas.

*Harris*, 61 M.J. at 398.

Finally, we cannot agree that defense counsel's brief concession during sentencing argument that Appellant's disorder was not a defense relieved the military judge of the responsibility to explore the defense with the accused. Defense counsel's naked concessions are not a substitute for the requirement to conduct a meaningful inquiry into any affirmative defense raised by the record, and to ascertain from the

accused himself whether his pleas are fully informed and voluntary. We cannot conclude from this record that Appellant was aware of the defense of lack of mental responsibility and that he had concluded that it did not apply to his case.

We conclude that Mr. Perle's testimony, in conjunction with Appellant's unsworn statement and Defense Exhibits B, C, and D, raised matters concerning Appellant's mental health that were in substantial conflict with his guilty pleas. The military judge should have reopened the providence inquiry, explained the conflict, and discussed the defense of lack of mental responsibility with Appellant and his counsel. Given our substantial concerns regarding Appellant's mental status, and after considering the entire record, we are unable to conclude that Appellant entered provident pleas of guilty. Article 45(a), UCMJ; *see United States v. Jones*, 34 M.J. 270, 272 (C.M.A. 1992).

### Decision

In light of the foregoing, the findings of guilty and the sentence are set aside. The record is returned to the Judge Advocate General, who may refer the matter to an appropriate convening authority. The convening authority may order a rehearing. If the convening authority determines that a rehearing is impracticable, the convening authority may dismiss the charges and the specifications.

Judges FELICETTI and LODGE concur.



For the Court,


Jane R. Lim
Clerk of the Court