UNITED STATES, Appellee,

v.

**Private First Class Jonathan B. ESTES, United States Army, Appellant.**

**ARMY 20020865.**

U.S. Army Court of Criminal Appeals.

31 Oct. 2005.

---

For Appellant: Colonel Robert D. Teetsel, JA; Lieutenant Colonel E. Allen Chandler, Jr., JA; Major Imogene M. Jamison, JA; Captain Terri J. Erisman, JA (on brief); Colonel Mark Cremin, JA; Lieutenant Colonel Mark Tellitocci, JA; Captain Charles L. Pritchard, Jr., JA (on supplemental brief); Major Allyson G. Lambert, JA.

For Appellee: Colonel Steven T. Salata, JA; Lieutenant Colonel Mark L. Johnson, JA; Lieutenant Colonel Theresa A. Gallagher, JA; Captain Abraham F. Carpio, JA (on brief); Colonel Lauren B. Leeker, JA; Lieutenant Colonel Margaret B. Baines, JA.

Before SCHENCK, Senior Judge, ZOLPER, and WALBURN, Appellate Military Judges.

## OPINION OF THE COURT

SCHENCK, Senior Judge:

A military judge sitting as a special court-martial found appellant guilty, pursuant to his pleas, of absence without leave (AWOL) (two specifications), wrongful use of marijuana (three specifications), and wrongful use of cocaine and methylenedioxymethampheta-

mine (MDMA)[1] (one specification each), in violation of Articles 86 and 112a, Uniform Code of Military Justice, 10 U.S.C. §§ 886 and 912(a) [hereinafter UCMJ]. The convening authority approved the adjudged sentence to a bad-conduct discharge, confinement for four months, forfeiture of $737.00 pay per month for four months, and reduction to Private E1. This case is before our court for review pursuant to Article 66, UCMJ, 10 U.S.C. § 866.

Appellant asserts his guilty plea was not knowing and voluntary because he had a severe mental disease or defect at the time of his criminal conduct, and his mental disease or defect undermined his trial rendering it fundamentally unfair. Appellant argues that if the military judge inquired about his mental health issues—prompted by remarks appellant made during his unsworn statement—the military judge would have ordered a sanity board. Appellant further claims he did not provide facts sufficient to sustain his plea of guilty to one AWOL specification because appellant did not admit he was absent from his unit, but instead, told the military judge he remained in the barracks during his absence. We find both assignments of error to be without merit.

## APPELLANT'S MENTAL DISEASE OR DEFECT

### Facts

Appellant pleaded guilty to, and was found guilty of, two AWOL specifications in violation of Article 86, UCMJ, and five drug-use specifications in violation of Article 112a, UCMJ, 10 U.S.C. § 912a, for using marijua-

na, cocaine, and MDMA on various occasions over a five-month period. Nothing inconsistent with appellant's guilty plea was raised during the providence inquiry.

In his unsworn statement during presentencing, appellant spoke extensively about his spiritual development which started during the summer of 1996. He explained he had found God, recognized himself as a sinner, and knew God would forgive him. Appellant stated he had been reading the Bible and had become wiser. Appellant further stated:

> In fact, it was August the 6th, 1996; I believe that was the day I got saved. And that day, you know, I found God. I know I found God because you know when you find God. You find it in your heart. You feel it. I'm sure you do. And that day, you know, I knew I was going to sin again, and I knew that God would forgive me for my sins. . . .

Thereafter, the military judge did not inquire into or explain to appellant the defense of lack of mental responsibility, nor did he ask appellant if he had discussed the defense with counsel.

### Initial Appeal and First Sanity Board

On 30 April 2003, appellant filed a brief with this court claiming in his only assignment of error that his plea to the second AWOL specification was improvident. On 31 October 2003, while awaiting action on this appeal, appellant requested, pursuant to Rule for Courts–Martial [hereinafter R.C.M.] 1203, that our court order an inquiry into both his mental responsibility and mental capacity in accordance with R.C.M. 706.[2] On

---

1. The drug 3,4–methylendioxymethamphetamine is also known as ecstasy, a popular drug of abuse among adolescents and young adults because of its combination of hallucinogenic and stimulant effects. *See DEA [Drug Enforcement Agency] Briefs & Background, Drugs and Drug Abuse, Drug Descriptions, at* http://www.usdoj.gov/dea/concern/mdma/mdma.html (last visited 20 Oct. 2005). Ecstasy is a Schedule I controlled substance under federal law, and has been since 1988. *See* Schedules of Controlled Substances; Scheduling of 3,4–Methylenedioxymethamphetamine (MDMA) Into Schedule I of the Controlled Substances Act; Remand, 53 Fed.Reg. 5,156 (22 Feb. 1988) (codified as amended at 21 C.F.R. § 1308.11(d)(11) (2005)); *see generally United*

*States v. Reichenbach,* 29 M.J. 128 (C.M.A.1989) (discussing placement of MDMA on Schedule I).

2. Rule for Courts–Martial 706 authorizes an inquiry to determine: (1) whether a soldier was mentally responsible for his offenses at the time he committed them, and/or (2) whether a soldier has the mental capacity, at trial, to understand the nature of the court-martial proceedings against him and to cooperate intelligently in his own defense. The procedures set forth in R.C.M. 706 apply to inquiries before and during trial, and to inquiries after trial proceedings have ended when a question arises concerning a soldier's mental capacity to understand and cooperate intelligently in the court-martial appeal process.

10 December 2003, we granted this request and ordered a sanity board to answer specific questions regarding appellant's mental responsibility at the time of his offenses, and his mental capacity to participate and assist in his defense at trial and during the appellate process.

On 23 March 2004, a board consisting of one psychiatrist and two psychologists reported that appellant "appears to be dependent on cannabis at the present time and likely has either a substance induced psychotic disorder or schizoaffective disorder, depressive type." Notwithstanding this diagnosis, the board determined that, at the time of trial, appellant was able to understand the nature of the proceedings and to cooperate intelligently in his defense. It also determined that at the time of his criminal conduct, appellant was able to appreciate the nature and quality or wrongfulness of his conduct. The board further concluded, as a result of his mental condition, appellant was "unable to understand the nature of the appellate proceedings [and] to cooperate intelligently in his pending appeal."

On 4 October 2004, based on the first sanity board's conclusion that appellant could not assist in his appeal because of his severe abuse of illegal drugs, this court stayed appellate proceedings and ordered appellant restored to active duty to receive medical treatment. *See* R.C.M. 1203(c)(5); *see also United States v. Korzeniewski,* 7 U.S.C.M.A. 314, 317, 22 C.M.R. 104, 107, 1956 WL 4745 (1956) (holding that a finding of lack of mental capacity tolls proceedings at any stage of the appellate process). We further directed the government to arrange for a new sanity board to examine appellant after completion of his medical treatment to determine his competency to assist in his appeal. We directed that this second board consist of three members, including at least one psychiatrist.

### Second Sanity Board

During the months following our October 2004 stay of appellate proceedings, appellant received mental health treatment. He then appeared before a second sanity board which reassessed his condition. On 7 December 2004, the second sanity board, consisting of only one member, a psychiatrist, reported that appellant "suffers from a most serious and severe mental disorder." The board further found, "this disorder does not render him incapable of understanding the nature of the proceedings before him." The board concluded appellant was able to "cooperate appropriately in his appeal" and "understand the nature of the appeal process."

We did not ask the second sanity board for an opinion regarding appellant's competency at the time of trial or responsibility at the time of his offenses; therefore, the board made no express findings on these subjects. But the board made three statements appellant considers relevant to this appeal. First, the board identified "hyper-religiosity of thinking" as one of the manifestations of his illness. Second, the board stated, "Current Psychosocial and Environmental Problems are determined to be of longstanding duration, i.e., months prior to and including his violations under the UCMJ." Third, the board reported that "his thought and substance use disorder came to [override] his appreciation of right and wrong." Although the second sanity board, consisting of only a psychiatrist, did not meet the court-ordered composition requirements, we will still consider its report because the board's composition did fulfill the R.C.M. 706(c)(1) requirements that a sanity board consist of "one or more persons" and "at least one ... psychiatrist."

### Third Sanity Board

Recognizing the second sanity board's composition did not meet the requirements of our October 2004 order, the government requested additional time to convene a three-member board to reevaluate appellant. On 6 January 2005, we granted the government's motion for an extension of time. Thereafter, a third sanity board consisting of the requisite number of members convened and reevaluated appellant in February 2005.

On 28 February 2005, a third sanity board, composed of three psychiatrists and one psychologist, concluded, as did the second sanity board, that appellant suffers from

*See* R.C.M. 909(c); R.C.M. 916(k)(1) discussion; R.C.M. 1203(c)(5).

a serious mental disorder, but is competent to assist in his appeal. The third sanity board repeated verbatim the second sanity board's findings that appellant is currently schizophrenic (manifested by "hyper-religiosity of thinking"), suffers from "polysubstance dependence" ("repeated use of ... cannabis, cocaine and hallucinogens"), and possesses other character traits of "relatively long-standing duration." The third sanity board also found appellant experienced social and environmental problems "of longstanding duration."[3]

## Law and Discussion

Appellant now asserts his guilty plea was improvident, i.e., not knowing and voluntary, because "he had a severe mental disease or defect at the time of his criminal conduct that impaired his ability to understand the nature and consequences or wrongfulness of his actions," possibly affording him the defense of lack of mental responsibility. *See* UCMJ art. 45, 10 U.S.C. § 845; R.C.M. 916(k)(1); *United States v. Cortes–Crespo*, 13 M.J. 420, 421 (C.M.A.1982). Appellant further asserts that, although no one mentioned "appellant's mental disease" at the time of trial, the military judge "had one clue that appellant had severe paranoid schizophrenia: appellant's unsworn statement." Appellate defense counsel cite appellant's religious statements described above, and state they are "consistent with" the second and third sanity boards' conclusions that appellant's disease is manifested by, among other things, his religiosity. We reject this argument.

*Whether the Military Judge Erred by Failing to Inquire into Appellant's Mental Responsibility, Discuss the Possibility of the Affirmative Defense, and Satisfy Himself that the Defense Did Not Apply*

▮ We review a military judge's acceptance of a guilty plea for an abuse of discretion. *United States v. Eberle*, 44 M.J. 374, 375 (C.A.A.F.1996). We will not overturn a military judge's acceptance of a guilty plea unless the record of trial shows a " 'substantial basis' in law and fact for questioning the guilty plea." *United States v. Erickson*, 61

M.J. 230, 232 (C.A.A.F.2005) (quoting *United States v. Milton*, 46 M.J. 317, 318 (C.A.A.F. 1997), and *United States v. Prater*, 32 M.J. 433, 436 (C.M.A.1991)). A providence inquiry into the accused's guilt must establish that the accused believes and admits he is guilty of the offense, and that the factual circumstances he admits to objectively support the guilty plea. *United States v. Garcia*, 44 M.J. 496, 497–98 (C.A.A.F.1996) (citing *United States v. Higgins*, 40 M.J. 67, 68 (C.M.A. 1994); *United States v. Davenport*, 9 M.J. 364, 367 (C.M.A.1980); R.C.M. 910(e)).

▮ Should an accused set up a matter inconsistent with his plea at any time during the proceeding, "the military judge must either resolve the apparent inconsistency or reject the guilty plea." *Garcia*, 44 M.J. at 498 (citing UCMJ art. 45(a) and R.C.M. 910(h)(2)). In general, if the accused raises a matter inconsistent with his guilty plea, the military judge should make a further factual inquiry to resolve the matter. *See United States v. Jemmings*, 1 M.J. 414 (C.M.A.1976). Furthermore, when such inconsistent matters "reasonably raise[ ] the question of a defense ... it [is] incumbent upon the military judge to make a more searching inquiry to determine the accused's position on the apparent inconsistency with his plea of guilty." *United States v. Timmins*, 21 U.S.C.M.A. 475, 479, 45 C.M.R. 249, 253, 1972 WL 14168 (1972).

The military justice system presumes that all soldiers are sane and competent and, therefore, responsible for their actions. *See* R.C.M. 909(a) and (b) (capacity to stand trial); R.C.M. 916(k)(1) and (k)(3)(A) (affirmative defense of lack of mental responsibility at time of offense); R.C.M. 1203(c)(5) (capacity to understand or cooperate intelligently in appellate proceedings). Although an appellant has the burden of proving lack of mental responsibility for his offenses or lack of mental capacity to stand trial, the standard of proof for each differs. First, the defense bears the burden of proving, by *clear and convincing evidence*, that an accused was unable to appreciate the nature and quality

---

**3.** In its report, the third sanity board noted that "around mid-December 2004, [appellant] left Fort Knox without authorization to return home,

ultimately resulting in his hospitalization ...." We will not consider this statement for any purpose during our review of appellant's case.

or the wrongfulness of his offenses, *at the time he committed them*, because he suffered from a severe mental disease or defect, i.e., he lacked mental responsibility at the time of his crimes. *See* UCMJ art. 50a(b), 10 U.S.C. § 850a(b); R.C.M. 916(k)(1) and (k)(3)(A).[4] Second, the defense bears the burden of proving, by a *preponderance of the evidence*, that an accused was suffering from a severe mental disease or defect *at trial* which rendered him unable to understand the nature of the proceedings against him or to cooperate intelligently in the defense of his case, i.e., he lacked the mental capacity to participate in his court-martial. *See* R.C.M. 909(e)(2).[5] Third, the defense also bears the burden of proving, by a *preponderance of the evidence*, that an appellant is suffering from a severe mental disease or defect *at the time of his appeal* which renders him unable to understand and to conduct or cooperate intelligently in the appellate proceedings, i.e., he lacks the mental capacity to appeal his convictions. *See* R.C.M. 1203(c)(5).

Our superior court has also recognized certain responsibilities borne by the convening authority, military judge, and the parties. In *United States v. Best*, 61 M.J. 376 (C.A.A.F. 2005), the court stated:

> We have emphasized the responsibility of the convening authority and the military judge to order a sanity board when required, as well as the duty of all participants in the process to bring to the attention of the convening authority or military judge any condition or behavior that may reasonably call into question the mental responsibility or competence of an accused. *United States v. Collins*, 60 M.J. 261 (C.A.A.F.2004).

*Id.* at 382.

If a question arises regarding the mental responsibility of an accused, R.C.M. 916(k)(3)(B) requires the military judge to either "order [a R.C.M. 706 inquiry into the mental capacity or mental responsibility of the accused,] or satisfy himself that the defense team has fully evaluated the possibility of the affirmative defense." *United States v. Sims*, 33 M.J. 684, 686 (A.C.M.R.1991).

■ Appellate defense counsel now assert that, based upon appellant's remarks during his unsworn statement, "the military judge should have inquired of the trial defense counsel whether he had determined if any mental [health] issues existed or if there was a history of mental illness." Furthermore, they contend that after such an inquiry, "a sanity board would surely have been ordered at the time of trial" by the military judge.

We recognize that sometimes remarks made in an unsworn statement should indicate to a military judge that an accused may have a defense of lack of mental responsibility (or insanity) and warrant further inquiry. In *Sims*, for example, we held that the military judge should not have accepted a guilty plea when the accused "explained in an unsworn statement that he had a friend named Corporal Myers that no one else could see or hear," heard voices he did not "have any control over," and was not aware of what he was doing when he took another soldier's money. *Id.* at 685–86.

But we must review the military judge's decision to accept appellant's guilty plea for an abuse of discretion. *See Eberle*, 44 M.J. at 375. Appellant did not raise matters in his unsworn statement concerning his mental state that were inconsistent with his pleas of guilty to AWOL and wrongful use of controlled substances. Having examined appellant's entire unsworn statement, we see noth-

---

4. Generally, once the affirmative defenses listed in R.C.M. 916 are raised by the evidence at trial, the government bears the burden of proving beyond a reasonable doubt that the particular defense is not valid or has not been proven in a particular case. However, for the R.C.M. 916(k) affirmative defense of lack of mental responsibility at the time of the offense, there is no shift in burden and the defense bears the burden of proving each element of this defense by clear and convincing evidence.

5. Unlike the affirmative defense of lack of mental responsibility at the time of the offense, R.C.M. 909 addresses a soldier's mental capacity to stand trial by court-martial. Lack of mental capacity is a procedural defense which prevents or postpones the trial until the accused recovers from his mental disease or defect and can understand and cooperate in his own defense. The defense also bears the burden of proving this procedural defense, but by a preponderance of the evidence.

**550**

ing that should have indicated to the military judge that appellant might have had a defense based on lack of mental responsibility. Appellant's unsworn statement merely expresses a strong religious sentiment, remorse at having done wrong, and gratitude for forgiveness. We do not conclude that the military judge should have suspected mental illness or a mental responsibility defense based upon these comments. Moreover, the military judge cannot be expected to reject a guilty plea "on the mere possibility of a defense." *United States v. Thomas,* 56 M.J. 523, 533 (N.M.Ct.Crim.App.2001) (upholding a guilty plea to attempted murder after concluding appellant's unsworn statement, "that he 'snapped' prior to attempting to smother his son[, did] not raise a mental responsibility defense or substantially conflict with the pleas"), *aff'd,* 56 M.J. 467 (C.A.A.F.2002) (summary disposition). Therefore, we conclude the military judge did not abuse his discretion by failing to inquire further.

*Whether this Court Should Conclude Appellant's Pleas Were Improvident Based on the Sanity Boards' Reports*

■ Unlike the military judge, this court has before it three sanity board reports. In deciding whether appellant's pleas may have been improvident, based on his mental condition either when he committed the offenses or at trial, we may consider these reports even though appellant did not raise the issue of mental responsibility at trial. *See United States v. Massey,* 27 M.J. 371, 374 (C.M.A. 1989); *see also United States v. Murphy,* 50 M.J. 4, 15 (C.A.A.F.1998) ("[W]hen not restrained by the 2–year limitation of Article 73, we have given preferential treatment to the question of mental responsibility when raised for the first time on appeal."). Furthermore, if appellant's mental condition constituted a "severe mental disease or defect" at the time of the offense that caused him to be "unable to appreciate the nature and quality or the wrongfulness" of his acts, appellant may have had an affirmative defense. R.C.M. 916(k)(1); *see Thompson v. United States,* 60 M.J. 880, 884 (N.M.Ct.Crim.App. 2005).

However, as our superior court has directed, "unless the results of the sanity board

give reason to believe that at a rehearing the factfinder would be persuaded to accept the accused's affirmative defense [of a lack of mental responsibility], there is no occasion to order a rehearing." *Massey,* 27 M.J. at 374. The Court of Appeals for the Armed Forces "has made plain that to constitute reversible error, the existence or outcome of a sanity board must have had a substantive effect on the trial." *Best,* 61 M.J. at 382–83. Moreover,

> to prevail on appeal an accused must convince an appellate court that a "different verdict might reasonably result" if the trier of fact had evidence of a lack of mental responsibility that was not available for consideration at trial.

*Id.* at 383 (quoting *United States v. Breese,* 47 M.J. 5, 6 (C.A.A.F.1997)). We hold this threshold has not been crossed.

The first sanity board is the only board that specifically addressed the question of whether, at the time of his criminal conduct, appellant was unable to appreciate the nature and quality or wrongfulness of his conduct as a result of his mental disease or defect. The first sanity board is also the only board that specifically addressed the question of whether, at the time of his trial, appellant was unable to understand the nature of the proceeding or unable to cooperate intelligently in his defense as a result of his mental disease and defect. Significantly, the first sanity board answered both of these questions in the negative. These conclusions strongly suggest that if we were to remand this case for a rehearing, the factfinder would not accept appellant's defense of lack of mental responsibility based upon the first sanity board's clinical psychiatric diagnosis of "Cannabis Abuse" at the time of appellant's offenses. *See Thompson,* 60 M.J. at 884 (similarly concluding that although the accused established he was incompetent at the time of appeal, he failed to demonstrate he lacked mental responsibility at the time of his criminal conduct or mental competency at the time of trial).

The second and third sanity board reports do not directly contradict, or report anything inconsistent with, the first board's assessment. The first board found appellant pre-

dominantly suffered from "Cannabis Abuse" at the time he committed the charged offenses (December 2001 through May 2002), and with "Cannabis Dependence" at the time the board convened in March 2004. The first sanity board found appellant mentally responsible for his offenses and capable of participating in his court-martial that had occurred twenty months earlier. It was not until December 2004, nine months after the first sanity board's diagnoses and twenty-nine months after appellant's August 2002 court-martial, that the second sanity board found appellant was currently suffering from "Schizophrenia, Paranoid Type" and "Polysubstance Dependence." In February 2005, the third sanity board made the same findings. Although the second and third boards concluded appellant was competent to understand the appellate process and participate in the proceedings, they made no conclusions concerning appellant's mental responsibility at the time of his offenses or his mental capacity at trial, nor did they find appellant's schizophrenia or polysubstance dependence existed at the time of the offenses or at trial.

The third sanity board further found, as did the second, that the only personality disorders appellant exhibited which were "of relatively longstanding duration" were:

> mixed personality traits and ego defense mechanisms ... an obsessive style of thinking ... compulsive behavior ... impulsivity ... lack of concern ... [and] behavior [that is] often inflexible [and] perseverative ....

Contrary to the defense assertion, we are not persuaded these additional findings equate to a determination that appellant lacked mental responsibility at the time he committed his offenses. Nor are we persuaded that at a rehearing a finder of fact would be convinced these additional findings translate directly into a successful defense of lack of mental responsibility.[6]

In this situation, as appellant argues, these reports *may raise the possibility* that a subsequent finder of fact might conclude appellant's mental condition had "an impact on, and perhaps was a major contributing factor to, his criminal conduct." But that is not the standard for ordering a rehearing under *Massey*. As noted above, the standard is whether these sanity board reports "give reason to believe that at a rehearing the factfinder would be persuaded to accept the accused's affirmative defense." *Massey*, 27 M.J. at 374. In view of the specific findings of the first sanity board, that standard has not been met.

Our superior court specifically rejected an alternative lower standard that would allow a rehearing merely "if the sanity inquiry should '*cast doubt upon*' the accused's 'mental responsibility when [he] commit[ed] the offenses.'" *Id.* (quoting *United States v. Massey*, 26 M.J. 671, 673 (A.F.C.M.R.1988)). That is all that has occurred here, and it is not enough. As our superior court's prescribed standard in *Massey* clearly reflects, there is a balance between the policy of giving an accused every possibility to present a defense and the competing policies of efficiency of litigation and finality of judgments.

For the foregoing reasons, we find appellant possessed the requisite mental responsibility and capacity when he committed his offenses, at trial, and during the appellate process. Moreover, appellant said nothing inconsistent during the providence inquiry or

---

**6.** The first sanity board found appellant exhibited general "Occupational Problems, Problems related to interaction with legal system/crime." The second and third sanity boards elaborated, and found appellant currently suffered from "psychosocial and environmental problems ... of a longstanding duration, i.e., months prior to and including his violations under [the] UCMJ." Appellate defense counsel assert the statement, that appellant's "thought and substance use disorder came to [override] his appreciation of right and wrong" is tantamount to the second and third boards finding appellant lacked mental responsibility at the time of his offenses. We

disagree. Reading this clause in context with the larger paragraph from which it was extracted, the third sanity board appears to be commenting on an unauthorized absence. Although the comment refers to appellant "again departing Fort Bragg," we do not find the comment refers to appellant's second charged AWOL offense. Appellant told the military judge during the providence inquiry he never left Fort Bragg during the period 7 June 2002 through 11 June 2002, his second period of absence. The referenced unauthorized absence may relate to conduct for which appellant was not charged and which occurred during an unknown time.

in his unsworn statement to render his pleas improvident.

## IMPROVIDENT PLEA TO AWOL SPECIFICATION

### Facts

Appellant pleaded guilty to, and was found guilty of, unauthorized absence from his unit, to wit: A Company, 51st Signal Battalion (Airborne), Fort Bragg, North Carolina, located at Building H–6308, from on or about Friday, 7 June 2002 until on or about Tuesday, 11 June 2002 (Specification 2 of Charge I), in violation of Article 86, UCMJ. During the providence inquiry, he told the military judge that, during his four-day absence, he slept late in the unit barracks located at Building H–5412, missed several formations, and wandered around post (going to the mess hall and shoppette) without reporting to his unit. The stipulation of fact, agreed to by both parties and admitted into evidence, merely restates the specification without providing any factual description of the offense. Appellant admitted he understood the elements and definitions of the offense as the military judge explained to him, and that, taken together, they accurately described what he did.

At trial, the following colloquy ensued between the military judge and appellant:

MJ: Where were you supposed to be on 7 June?

ACC: Reporting to formations, Your Honor.

MJ: And where did you go?

ACC: I didn't go anywhere, Your Honor. I just—I stayed in my barracks.

MJ: And where was your barracks?

ACC: Hotel–5412, off of Semaphore.

MJ: Is that where the unit is located too, or is that a different location?

ACC: It's—that's the location of where the unit is also, Your Honor.

MJ: Okay. So the 7th of June was a Friday. You just didn't go to work Friday morning?

ACC: I didn't go to work at all, Your Honor.

MJ: The 11th of June was a Tuesday. You went back to work on Tuesday. You just took a long weekend then?

ACC: Yes, Your Honor.

MJ: Where did you go?

ACC: I didn't go anywhere. I just—
[Pause.]

MJ: Stayed in the barracks?

ACC: Yes, Your Honor.

. . . .

MJ: Well, did you stay in your barracks room that entire time? Did you float around post, or what did you do?

ACC: I floated around post a little bit; the chow hall and stuff, maybe the shoppette. But I didn't go anywhere in particular. . . .

. . . .

MJ: So what time was formation on the 7th of June, 0600 or 0630?

ACC: 0630, I believe, Your Honor.

MJ: And you just didn't show up?

ACC: Yes, Your Honor.

MJ: You slept in and just kind of goofed off the rest of the day?

ACC: Yes, Your Honor.

MJ: You did that all weekend, sort of goofed off, stayed around and just didn't do much of anything?

ACC: Yes, Your Honor.

MJ: And Monday was, sort of, the same thing?

ACC: Yes, Your Honor.

MJ: And what time did you go back to work on Tuesday, the 11th?

ACC: I believe I made formation, Your Honor.

MJ: So those 4 days, what were you supposed to be doing? Was the unit off, or were they in [the] field, or what was the unit doing?

ACC: They were busy working. I don't know exactly what they were doing, Your Honor.

MJ: They were busy working and you were busy goofing off?

ACC: Yes, Your Honor.

MJ: Did you understand that you were supposed to be at your place of duty?

ACC: Yes, Your Honor.

. . . .

MJ: Okay. So between the 7th of June and the 11th of June, you were supposed to be in the unit doing something—doing something constructive?

ACC: I could have been doing something constructive at the unit, sir.

MJ: Well, you should have been at formations; at PT formation on the 7th of June?

ACC: Yes, Your Honor.

MJ: And then after PT formation showed up to another formation, at perhaps 0900?

ACC: Yes, Your Honor.

MJ: Some sort of work call formation?

ACC: Yes, Your Honor.

MJ: Then you'd have some sort of duties to do?

ACC: Yes, Your Honor.

MJ: Would you have another formation, perhaps after lunch or, in the afternoon, before you were released?

ACC: In the afternoon, before I was released, Your Honor.

MJ: There would be another formation?

ACC: Yes, Your Honor.

MJ: Did you make any of those formations?

ACC: No, Your honor.

Appellant told the military judge he was not working in any particular position at his unit, but admitted he should have been reporting to formations, did not have permission to stop performing military duties, and purposely avoided working and contacting his chain of command.

### Law and Discussion

 We again review the military judge's acceptance of appellant's guilty plea for an abuse of discretion, *Eberle*, 44 M.J. at 375, and will not overturn the military judge's acceptance thereof unless the record of trial shows a substantial basis in law and fact for questioning it. *Prater*, 32 M.J. at 436. A providence inquiry into a guilty plea must establish that the accused believes and admits he is guilty of the offense and that the factual circumstances admitted by the accused objectively support the guilty plea.

*Garcia*, 44 M.J. at 497–98 (citing *Higgins*, 40 M.J. at 68). However, unsupported "conclusions of law recited by an accused are insufficient to provide a factual basis for a guilty plea." *United States v. Outhier*, 45 M.J. 326, 331 (C.A.A.F.1996) (citing *United States v. Terry*, 21 U.S.C.M.A. 442, 45 C.M.R. 216, 1972 WL 14158 (1972)).

Article 86(3), UCMJ, provides, "Any member of the armed forces who, without authority ... absents himself or remains absent from his unit, organization, or place of duty at which he is required to be at the time prescribed; shall be punished as a court-martial may direct." The elements of this offense are:

(a) That the accused absented himself or herself from his or her unit, organization, or place of duty at which he or she was required to be;

(b) That the absence was without authority from anyone competent to give him or her leave; and

(c) That the absence was for a certain period of time.

*Manual for Courts–Martial, United States* (2002 ed.) [hereinafter *MCM*, 2002], Part IV, para. 10b(3). An "[u]nauthorized absence under Article 86(3) is an instantaneous offense. It is complete at the instant an accused absents himself or herself without authority." *Id.* at Part IV, para. 10c(8). The duration of the absence is not an essential element of the offense but constitutes a matter in aggravation for purposes of determining the authorized maximum punishment. *See id.* at Part IV, paras. 10c(4) and 10c(8).

 Appellate defense counsel now assert appellant's guilty plea to AWOL from 7 June 2002 to 11 June 2002 was improvident because appellant did not admit during the plea inquiry that he was "ever absent from his unit." Appellate government counsel agree the plea inquiry does not support the offense of AWOL (in violation of Article 86(3), UCMJ) but urge us to affirm the closely-related offense of failure to go to an appointed place of duty (in violation of Article 86(1), UCMJ). We decline to accept the government concession and find appellant's plea provident to the offense as charged.

We base our decision, in part, upon principles found in *United States v. Vaughn,* 36 M.J. 645 (A.C.M.R.1992). In *Vaughn,* Private (PVT) Vaughn pleaded guilty to being AWOL from his unit for approximately twenty days. He told the military judge he was supposed to have been at an accountability formation and did not report in order to avoid going to a field exercise. Instead, PVT Vaughn stayed in his barracks room: Our court found that although PVT Vaughn "remained in his room and in the unit area," *id.* at 647, he was AWOL from his unit because his fellow soldiers were "in the field participating in . . . an exercise." *Id.* at 648. Furthermore, we found PVT Vaughn's mere casual presence in the barracks was not inconsistent with his plea of guilty to AWOL for the period charged. *Id.; cf. United States v. LaCaze,* 2 C.M.R. 443, 1952 WL 1755 (A.B.R.1952) (affirming desertion conviction for quitting organization with intent to avoid hazardous duty where soldier absented himself from his unit's forward combat area and remained in his tent near unit rear command post).

Appellate defense counsel argue appellant was not absent from his unit because he remained in the unit barracks.[7] However, the essence of appellant's offense was that he was not present with his fellow soldiers, i.e., his "unit," performing military duties during the work day. During the providence inquiry, appellant admitted he missed all formations on Friday, 7 June 2002, did not go to work all day, and stayed in his barracks room until he returned to duty on Tuesday, 11 June 2002. Appellant admitted his unit was performing military duties without him, and he understood he was supposed to be working with the unit but was busy "goofing off" in the barracks. Although unsure of what his unit was actually doing, appellant stated his unit was working, and he "could have been doing something constructive at the unit" had he not been absent and in the barracks. When the military judge asked appellant whether he intentionally avoided going to the unit to work, appellant answered affirmatively. Appellant stated he purposely missed formations and did not let anyone in his chain of command know he was in his barracks room available to perform any assigned duties.

Appellant's agreement that his barracks building is located "where the unit is also" is of no consequence. Appellant was charged with an unauthorized absence from his unit located at building H–6308, and admitted he remained in the barracks at building H–5412, or elsewhere,[8] from Friday until Tuesday. In all likelihood, these buildings were collocated, and appellant admitted the unit was not in the barracks building. Nevertheless, the building where a unit is normally located may not be the unit's physical location. For example, if a unit is in formation behind the post theater, or conducting training at a confidence course, or participating in a field exercise at a staging area, the unit location

---

7. Appellate defense counsel rely upon our sister court's position in *United States v. Skoff,* 1990 CMR LEXIS 1008 (N.M.C.M.R. 2 Oct. 1990) (unpub.). *See United States v. Smith,* 37 M.J. 583, 586 (N.M.C.M.R.1993) (stating servicemember who remains in barracks that are part of, and controlled by, his assigned unit cannot be absent without authority from that unit). We decline to take our sister court's position that ownership or control of a barracks building is the determining factor in whether a soldier is absent from his unit while remaining in those barracks. *Id.* at 586–87 ("The question is not simply whether an accused, who is charged with absence from his unit, is assigned to a tenant activity or the host installation when he or she remains in the barracks rather than reporting for or remaining on duty. The question is which activity controls the barracks: e.g., what unit or activity assigns personnel to that barracks, posts watches in that barracks, conducts inspections, or has the responsibility for ordering maintenance and repairs.").

8. In some cases, such conduct may constitute a failure to report for duty under Article 86(1), UCMJ. In this case, however, even if we found appellant's plea improvident under Article 86(3), UCMJ, we would not find appellant guilty of the closely-related offense of failure to go to an appointed place of duty under Article 86(1), UCMJ, because the record lacks sufficient evidence that "a certain authority appointed a certain time and place of duty" for appellant. *MCM,* 2002, Part IV, para. 10(b)(1); *see United States v. Epps,* 25 M.J. 319, 322–23 (C.M.A.1987); *United States v. Gonzalez,* 60 M.J. 572, 579 (Army Ct.Crim.App.2004).

will be any of these particular places, not its headquarters.

A unit is comprised of soldiers, not buildings.[9] It is irrelevant that a soldier's barracks room happens to be within the "company area" or under unit control. Under the defense "company area" theory, a soldier required to live in the barracks could remain there, forego engaging in military duties with his fellow soldiers, and yet not be considered absent from his unit. But if the same soldier resided in off-post housing, he would be guilty of an unauthorized absence from his unit by staying at home. We reject this "company area" theory and find the military judge properly accepted appellant's plea of guilty to AWOL for the period charged.

9. In the military context, unit is defined as "a part of a military establishment that has a prescribed organization (as of personnel and materiel)." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 2500 (1981 ed.). A unit is also "[a]ny military element whose structure is prescribed by competent authority, such as a table of organization and equipment; specifically, part of an organization." Joint Chiefs of Staff, Joint Pub. 1–02, Dep't of Def. Dictionary of Military and Associated Terms, App. A: Abbreviations and Acronyms (12 Apr. 2001) (as amended through 9 June 2004); see Army Reg. 310–25, Military Publications: Dictionary of United States Army Terms (Short Title: AD), para. 10 (15 Oct. 1983); Dep't of Army, Field Manual 101–5–1, Operational Terms and Graphics, Ch. 1 (30 Sept. 1997). Units, therefore, are comprised of people, and include soldiers organized into staffs, crews, teams, sections, squads, platoons, etc., that work and train together to accomplish operational missions irrespective of their location.

## CONCLUSION

We have considered the matters personally asserted by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and find them to be without merit.

Accordingly, the findings of guilty and the sentence are affirmed.

Judge ZOLPER and Judge WALBURN concur.